901 A.2d 363

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JOSEPHINE CASTAGNA, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF, v. JEAN P. MORALES, DEFENDANT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. THOMAS J. D'AMICO, DEFENDANT–RESPONDENT.

Argued March 6, 2006—Decided July 17, 2006.

*Steven J. Kaflowitz,* Assistant Prosecutor, argued the cause for appellant (*Theodore J. Romankow,* Union County Prosecutor, attorney).

*Jean D. Barrett* argued the cause for respondent Josephine Castagna (*Ruhnke & Barrett,* attorneys).

*Alan L. Zegas* argued the cause for respondent Thomas D'Amico (*Mr. Zegas,* attorney; *Mr. Zegas, Daniel M. Rosenberg and Mary Frances Palisano,* on the briefs).

*Lawrence S. Lustberg and Megan Lewis* submitted a brief on behalf of amicus curiae, Association of Criminal Defense Lawyers of New Jersey (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

Justice WALLACE, JR., delivered the opinion of the Court.

Defendants Josephine Castagna and Thomas D'Amico were tried together with Jean Morales for various charges arising out of the death of Bennett Grant. Castagna was convicted of second-degree aggravated assault, *N.J.S.A.* 2C:12–1(b), and D'Amico was convicted of first-degree aggravated manslaughter, *N.J.S.A.* 2C:11–4(a), two counts of second-degree official misconduct, *N.J.S.A.* 2C:30–2(a) and (b), and fourth-degree obstruction of justice, *N.J.S.A.* 2C:29–1. On appeal, both defendants asserted reversible error in the trial court's refusal to allow defense counsel an opportunity to cross-examine thoroughly one of the State's crucial witnesses concerning the reason the witness changed her statement after a polygraph test revealed she was not being truthful. The Appellate Division reversed and remanded for a new trial. We conclude it was error to limit the cross-examination of the witness about the results of her polygraph test, but that the error was harmless beyond a reasonable doubt.

D'Amico also claimed he received ineffective assistance of counsel, and the Appellate Division agreed. We conclude that on this record, D'Amico failed to establish his claim for ineffective assistance of counsel. We reverse and remand to reinstate the convictions and sentences.

I.

The disputed facts are more fully set forth in the Appellate Division decision. *State v. Castagna,* 376 *N.J.Super.* 323, 870 *A.2d* 653 (2005). We recite the facts necessary to decide this appeal.

On the evening of October 23, 1999, Edward Gentile, Carmine Perrotti, Lewis Rodriguez, Christopher Longo, Thomas D'Amico, Violet Arias, Ann Truzzolino, Alvin Baez, and Josephine Castagna were present at Sinners Go–Go Bar (Sinners) in Elizabeth. Some time around 10:30 p.m., Arthur McKeown and Bennett Grant arrived at Sinners. Truzzolino, who was a friend of McKeown's, approached the two men and McKeown introduced Grant to her. Later, several of Truzzolino's friends, including Arias and Castagna, joined that group.

After 1:00 a.m., McKeown and Grant decided to leave. Truzzolino joined them as they departed. Arias, who had driven to Sinners with Truzzolino, followed them outside, where she convinced Truzzolino to return to the bar. Grant objected and followed Arias and Truzzolino back inside Sinners. Shortly thereafter, an argument ensued. Sinners' management intervened and asked Grant to leave. Grant acceded, exited Sinners, and started to walk to the car with McKeown. Arias, Truzzolino, and other patrons followed Grant and began screaming and running after him. Arias approached and attempted to hit Grant.

Tony Velez, a doorman at Sinners, testified that when Arias brought Truzzolino back inside, Grant also returned. Arias was angry and cursed at Grant. Grant was asked to leave and he did. Velez noticed a group of patrons run outside, surround Grant and McKeown and punch and kick them. Eventually Grant and McKeown fled towards a nearby bridge with the crowd in pursuit. At that time, a car pulled up and several people entered the car, which sped after Grant and McKeown.

Joseph Machado, Sinners' general manager, and Pablo Fragoso, the club's operations manager, both testified that there was an altercation between Arias and Grant in Sinners that night. Both agreed that Arias was very angry and cursed at Grant. Machado tried to restrain Arias, but she wriggled free and ran out the back door. Fragoso followed them outside. He saw Arias pulling at Grant's hair as she attempted to strike him, but Grant blocked her punches with his arm. Fragoso described Arias as being out of

control. By then, a crowd had gathered around Grant, screaming hostile words at him. Grant ran and the crowd pursued him. Fragoso observed the crowd running towards the bridge, and he followed them. Fragoso noticed a Jeep stopped on the bridge with its doors open. He observed defendants and others kicking Grant. He claimed that Arias was enraged and repeatedly called Grant "names" as she kicked him and hit him with a piece of metal. Eventually, Fragoso pulled Arias away and tried to stop D'Amico from kicking Grant. D'Amico was an Elizabeth police officer and was off duty the night of the incident. Fragoso yelled at D'Amico, "What are you doing? You know this is your job." Fragoso then observed Morales drop a Belgian block, weighing approximately twenty-five pounds, on Grant's head. The crowd grew silent and began to disperse.

Elizabeth and Jose Mojica lived in the area where the bridge was located and heard the commotion. Mrs. Mojica called the police while her husband peered out the window. Mr. Mojica noticed a Jeep stop, pick up two people, and pursue a man. As the Jeep overcame the man, the front passenger side door swung open, striking the man who tried to maintain his balance by holding the front of the Jeep. The Jeep made a sudden stop, jerking the man forward and causing him to fall to the ground.

Arias testified that she saw Carmine Perrotti's Jeep approach. She noticed D'Amico enter the front passenger seat and Perrotti enter the back seat. The Jeep then pulled beside Grant. When D'Amico opened the front passenger door, it struck Grant. Arias admitted that she and the other defendants kicked Grant, and that Castagna hit him with a rod.

Alvin Baez testified that Lewis Rodriguez was driving Perrotti's Jeep when it stopped for Perrotti and D'Amico. Baez claimed that when the Jeep drove onto the bridge, it stopped, and Grant ran into the front passenger side fender. D'Amico opened the passenger door as Grant fell to the ground. Baez admitted he kicked Grant a couple of times on the right side of his face. The

police arrived and investigated the incident. Grant was rushed to the hospital. He died from his injuries five months later.

Subsequently, Arias, Baez, Castagna, D'Amico, Gentile, Morales, and Perrotti were indicted for various crimes arising from the incident. Arias, Baez, Gentile, and Perrotti all pled guilty to second-degree reckless manslaughter, *N.J.S.A.* 2C:43–7.2. Arias, Gentile, and Perrotti each received a seven-year sentence with an eighty-five percent parole disqualifier under the No Early Release Act (NERA), but Baez received a non-NERA sentence because he was the first to reach agreement with the State.

Defendants Castagna, D'Amico, and Morales were tried jointly before a jury between January 7 and February 11, 2002. In addition to the numerous eyewitness accounts concerning the incident, the State presented the expert testimony of Dr. Carlos Fonseca, an assistant medical examiner for the Union County Medical Examiner's Office, who performed an autopsy on Grant. He concluded that Grant's death was caused by complications from multiple head trauma, consistent with being kicked and struck by blunt objects. He opined that no single blow was more likely than any other to have caused Grant's death.

Dr. Douglas Miller testified as an expert in neuropathology. He opined that the multiple contusions on Grant's brain caused his death, and that Grant would have died even if the Belgian block had not been dropped on his head. D'Amico presented Dr. Daniel Perl as an expert in neuropathology. Dr. Perl concluded that the large depressed skull fracture most likely caused Grant's death and that the fracture was likely caused by the crushing weight of the block. Dr. Perl disagreed with Dr. Miller's conclusion that death would have occurred without the crushing injury from the Belgian block.

D'Amico testified in his own defense. He recalled seeing Arias screaming at Grant inside Sinners. He claimed that Grant hit Arias, so he grabbed Grant by his jacket and told him to leave. Later, he followed the crowd outside in pursuit of Grant. D'Amico said that a Jeep approached Grant, but it did not hit him.

D'Amico claimed he was not inside the Jeep. He admitted that he kicked Grant hard in his lower back, buttocks, and legs, but claimed he did not intend to cause serious bodily injury to Grant. D'Amico recalled that Fragoso grabbed him and told him that he could lose his job. D'Amico claimed he never saw Morales drop a block on Grant's head. He admitted that he lied to the police when he reported what happened that evening.

The jury found Castagna guilty of aggravated assault as a lesser-included offense of reckless manslaughter, and not guilty of murder, possession of a weapon for an unlawful purpose, and possession of a weapon. The trial court imposed an eight-year sentence with an eighty-five percent parole disqualifier.

The jury found D'Amico guilty of aggravated manslaughter, two counts of official misconduct, and obstruction of justice, but found him not guilty of murder. The trial court imposed a twenty-year sentence with an eighty-five percent parole disqualifier for manslaughter and, after merger of the remaining convictions, a consecutive seven-year sentence for official misconduct. Thus, D'Amico's base aggregate sentence was twenty-seven years.

The jury found Morales guilty of murder, aggravated manslaughter, possession of a weapon for an unlawful purpose, and possession of a weapon. After merger, the trial court imposed a fifty-year term of imprisonment with a thirty-year parole disqualifier.

Castagna, D'Amico, and Morales appealed. The Appellate Division consolidated the appeals and, in a published opinion, reversed the convictions and remanded for a new trial. *Castagna, supra,* 376 *N.J.Super.* at 354, 870 *A.*2d 653. The panel found that defendants were deprived of their constitutional right to cross-examination when the trial court prohibited them from asking Arias questions concerning the results of a stipulated polygraph examination. *Ibid.* The panel also concluded that D'Amico received ineffective assistance of counsel. *Id.* at 363, 870 *A.*2d 653. Additionally, the panel reversed Morales' conviction because the trial court failed to instruct the jury on the elements of pas-

sion/provocation manslaughter as a lesser-included offense of the crime of murder. *Id.* at 358, 870 *A.2d* 653.

We granted the State's petition for certification in *State v. Castagna,* 185 *N.J.* 35, 878 *A.2d* 852 (2005), and *State v. D'Amico,* 185 *N.J.* 36, 878 *A.2d* 853 (2005), but denied the cross-petition in *State v. Castagna,* 185 *N.J.* 36, 878 *A.2d* 853 (2005) and the State's petition in *State v. Morales,* 185 *N.J.* 36, 878 *A.2d* 852 (2005). We subsequently granted amicus curiae status to the Association of Criminal Defense Lawyers of New Jersey.

## II.

The State contends that the Appellate Division erred in concluding that the polygraph evidence was admissible as a matter of constitutional law and fundamental fairness. The State maintains that other defendants may not admit polygraph test results merely because one defendant enters into a stipulation with the State that the results of a polygraph test will be admissible at that defendant's trial. As to the other defendants, the State urges that it is an unstipulated polygraph examination that is not admissible. Further, the State urges that because defendants were given ample leeway to cross-examine the witness about changing her statement after being confronted with evidence that she had lied, any error in not permitting the jury to hear about the polygraph test results was harmless.

In regard to D'Amico, the State contends defense counsel's opening statement acknowledging that D'Amico was a criminal and would testify in his own defense was trial strategy and did not constitute ineffective assistance of counsel. The State urges that defense counsel's tactic of seeking to gain credibility by not denying the obvious was a permissible strategy. Moreover, the State notes that counsel's strategy may have been dictated by D'Amico, and, therefore, D'Amico's claim should be resolved in a post-conviction relief proceeding in which counsel will have the opportunity to explain the challenged conduct. Finally, the State

maintains that there is no evidence that, but for defense counsel's conduct, the outcome would have been different.

Castagna and D'Amico contend that the Appellate Division correctly concluded that they were denied their constitutional right to confront a witness when the trial court precluded defense counsel from cross-examining a prosecution witness on the results of a stipulated polygraph. Castagna adds that the trial court's ruling permitted the prosecutor to conceal from the jury the same polygraph evidence that the State would have argued was probative and reliable if the witness had been on trial.

D'Amico maintains that the Appellate Division correctly concluded that "once the State agreed to be bound by the polygraph results, it could not avoid use of those results by a third party, when to do so would compromise the rights of defendants to confrontation and a fair trial." Further, he contends that he received ineffective assistance of counsel when his attorney stated in his opening that defendant is a criminal who will be found guilty of "probably one or maybe two counts of misconduct and of obstruction of justice," and that defendant "is going to get on the stand and take responsibility for his acts." D'Amico urges that counsel's statement that D'Amico would testify made it untenable for him not to testify and that such a decision cannot properly be made at the outset of trial. He maintains that counsel's misconduct is obvious, and that he need not wait for a post-conviction relief petition to raise that argument.

Amicus Association of Criminal Defense Lawyers of New Jersey contends that the trial court's ruling excluding the polygraph test results contravened defendants' constitutional right to confront the evidence against them through vigorous cross-examination necessary to a fair determination of the issues.

### III.

We first address defendants' argument that the trial court's ruling that precluded them from cross-examining the State's wit-

ness with the results of her polygraph tests was a violation of their constitutional right to cross-examination.

### A.

The issue arose as follows. During the police investigation of the incident, Arias gave the police at least three versions of the events that transpired on October 23 and 24, 1999. In the presence of her lawyer, she voluntarily gave her first statement on October 26, 1999. At that time, Arias denied any involvement in the attack upon Grant and only admitted to seeing Morales strike Grant. She indirectly implicated Castagna by stating that after the incident Castagna expressed alarm about leaving her fingerprints on a pipe at the scene.

Following the indictment, Arias was interviewed a second time. On September 4, 2001, in the presence of her attorney, she admitted she lied in portions of her October 26, 1999, statement. For the first time, Arias admitted she kicked Grant on his legs, but she denied striking him on his head or using a weapon. She implicated the other co-defendants in the assault and claimed that Castagna hit Grant with a pipe.

The State agreed to offer a plea agreement to Arias if she would take a polygraph examination. Arias agreed to take the test and that the results could be admitted in evidence if she went to trial. Detective Laurent Gauthier of the New Jersey State Police conducted the polygraph examination. In his report, Detective Gauthier stated that

[t]he purpose of the examination was to determine if the above named subject was being truthful when she denied ever striking Bennett Grant on his head during an assault involving the examinee and six other codefendants which took place on the relocated Bayway Bridge, Elizabeth, New Jersey, on October 24, 1999. Bennett Grant died as a result of injuries sustained during the assault on March 21, 2000.

Case Investigators also requested that a second test be conducted regarding the truthfulness of the statement Violet Arias gave earlier on this date (September 4, 2001) to the Prosecutor's Office.

TEST 1

1. Concerning Bennett Grant, did you hit his head with any object?

2. Concerning Bennett Grant, did you hit his head with your foot?

3. Concerning Bennett Grant, did you ever hit his head?

TEST 2

1. Concerning the statement you gave today, did you tell the truth?

2. Concerning the statement you gave today, was it a truthful one?

3. Concerning the statement you gave today, were you being truthful?

Detective Gauthier concluded that "[e]valuation of the polygraph charts revealed significant physiological changes relating to the relevant questions [Arias] answered during the polygraph examination" and that Arias "was being deceptive during her polygraph examination."

After being informed of the test results, Arias agreed to provide another statement. In her third statement, Arias admitted that she kicked Grant in the head but continued to deny that she hit Grant with an object. Following her third statement, Arias was not asked to take another polygraph test. Arias agreed to plead guilty to reckless manslaughter, and the prosecutor recommended a custodial sentence of seven years with an eighty-five percent period of parole ineligibility. The State conditioned the plea agreement on Arias's providing "truthful testimony" against her co-defendants.

At trial, defendants moved to use the polygraph test results to impeach Arias's testimony. They also sought to call the polygrapher as a witness. Defendants argued in the alternative that Arias should be barred as a witness because the polygraph results demonstrated that she would commit perjury if she testified that she had no object in her hand during the assault. The trial court denied the motion, reasoning that the defense had no right to admit the polygraph test results because they are not admissible absent a stipulation, and the defendants were not a party to the stipulation between Arias and the State. The trial court made it clear that defendants were not prohibited from cross-examining Arias regarding any inconsistencies in her testimony, but the defense was precluded from making any reference to the polygraph test results and the opinion of the polygrapher.

During Arias's direct testimony, she admitted that she had not always told the truth to the prosecutor. In response to the prosecutor's question why she gave a third statement, Arias declared that she did so because she "was very scared and confused and I just wanted to be truthful and honest because I don't want to live with the lie no more." Counsel for D'Amico immediately objected. He argued that the prosecutor elicited a reason for Arias's deception that made it appear that she came forward with her last version of events "out of the goodness of her heart to no longer tell a lie," instead of the real reason, which was that she was confronted with the results of the polygraph test. The trial court overruled that objection and suggested defense counsel could ask Arias, "Wasn't it true that the Prosecutor confronted you with other information about your lying and you realized you were finally going to tell the truth because you knew your plea agreement was in jeopardy and you know you faced life with 30 if you didn't tell the truth?"

During cross-examination, D'Amico's counsel was able to elicit from Arias that she finally told the prosecutor the truth about kicking Grant in the head because the Prosecutor's Office confronted her with evidence that she was lying. Arias acknowledged that she believed her plea agreement was in jeopardy when the prosecutor confronted her with that evidence.

During cross-examination, Arias claimed she lied in her first statement because she did not want to be arrested and because she was afraid the police would think she was the woman who had assaulted Grant with a pipe. Arias said she lied in her second statement in an effort to get a better plea bargain. Arias again admitted that when the Prosecutor's Office confronted her with evidence that she was lying, she decided to tell the truth in her third statement.

## B.

█ The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy

the right ... to be confronted with the witnesses against him." *U.S. Const.* amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 *U.S.* 400, 406, 85 *S.Ct.* 1065, 1069, 13 *L.Ed.*2d 923, 927–28 (1965). Our state constitution provides the same guarantee. *N.J. Const.* art. I, § 10.

■ "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 *U.S.* 836, 845, 110 *S.Ct.* 3157, 3163, 111 *L.Ed.*2d 666, 678 (1990). In *Craig,* the United States Supreme Court outlined four key elements of a defendant's right of confrontation: physical presence; the oath; cross examination; and observation of demeanor by the trier of fact. *Id.* at 846, 110 *S.Ct.* at 3163, 111 *L.Ed.*2d at 679; *see also State v. Smith,* 158 *N.J.* 376, 385, 730 *A.*2d 311 (1999). In the present case we are concerned with cross-examination, which has been described as "the 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green,* 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.*2d 489, 497 (1970) (citation omitted); *see also Davis v. Alaska,* 415 *U.S.* 308, 316, 94 *S.Ct.* 1105, 1110, 39 *L.Ed.*2d 347, 353 (1974) (explaining that "cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested"); *State v. Garron,* 177 *N.J.* 147, 169, 827 *A.*2d 243 (2003) (noting right to confrontation "among the minimum essentials of a fair trial") (quoting *Chambers v. Mississippi,* 410 *U.S.* 284, 294, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.*2d 297, 308 (1973)).

■ To be sure, the right of confrontation is not absolute. *Smith, supra,* 158 *N.J.* at 384, 730 *A.*2d 311. In an appropriate case the right of confrontation will yield to other " 'legitimate interests in the criminal trial process,' such as established rules of evidence and procedure designed to ensure the fairness and reliability of criminal trials." *Garron, supra,* 177 *N.J.* at 169, 827 *A.*2d 243 (quoting *Chambers, supra,* 410 *U.S.* at 295, 302, 93 *S.Ct.*

at 1046, 1049, 35 *L.Ed.*2d at 309, 313). However, "when the mechanistic application of a state's rules of evidence or procedure would undermine the truth finding function by excluding relevant evidence necessary to a defendant's ability to defend against the charged offenses, the Confrontation and Compulsory Process Clauses must prevail." *Ibid.*

Recently, we emphasized that the decision in *Davis* provides the framework to examine the interplay between a state's evidentiary rule and a defendant's confrontation rights. *State v. Guenther,* 181 *N.J.* 129, 148, 854 *A.*2d 308 (2004). In *Davis, supra,* a juvenile serving a probationary term cooperated with the State and provided testimony implicating the defendant in a burglary. 415 *U.S.* at 310–11, 94 *S.Ct.* at 1107, 39 *L.Ed.*2d at 350. The defendant sought to show that the juvenile was motivated to gain favor from the State to impeach the juvenile's credibility by revealing bias in favor of the State. Id. at 311, 94 *S.Ct.* at 1108, 39 *L.Ed.*2d at 351. The Supreme Court weighed the procedural rule of protecting the privacy of a juvenile's record against the defendant's right of confrontation, and concluded that "[t]he State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross examination for bias of an adverse witness." *Id.* at 320, 94 *S.Ct.* at 1112, 39 *L.Ed.*2d at 356.

 In the present case, we must examine the State's interests in excluding polygraph evidence against defendant's right to cross-examination. The ultimate question is whether "exclusion serves the interests of fairness and reliability." *State v. Williams,* 184 *N.J.* 432, 444, 877 *A.*2d 1258 (2005).

 Here, the State argues that New Jersey's policy of excluding unstipulated polygraph examination results is longstanding and should not be disregarded. The State urges that *State v. McDavitt,* 62 *N.J.* 36, 297 *A.*2d 849 (1972), established the parameters for admission of polygraph evidence, and that those parameters are not present. In *McDavitt,* the Court held that polygraph evidence in general is not sufficiently reliable to be admissible on

its own merit. *Id.* at 44, 297 *A.2d* 849. Such evidence, however, may be admitted in a criminal case when the parties enter into a stipulation for the defendant to take the test and agree to its admissibility. *Id.* at 46, 297 *A.2d* 849. In the present case, because the stipulation for admission of the polygraph evidence was solely between Arias and the State and because Arias was not on trial, the State contends that the polygraph test results were unstipulated as to the defendants herein and therefore not admissible under *McDavitt.*

We need not reexamine our holding in *McDavitt* to decide this case. Defendants sought to cross-examine Arias to discredit her testimony. They asserted that the inconsistency of her prior statements and the polygraph test results would have cast doubt on her version of the events, especially her claim that she had not hit the victim with an object. That evidence could have undermined Arias's claim that Castagna hit the victim with an object, and it could have been used to cast doubt on Arias's general veracity and capacity to tell the truth. The jury was entitled to hear that Arias changed her story after she was confronted with the results of her polygraph test. That evidence was "relevant and necessary to a fair determination of the issues." *Garron, supra,* 177 *N.J.* at 180, 827 *A.2d* 243.

We are convinced that the limitation placed on defendants' right of cross-examination did not serve the interests of fairness and reliability. To be sure, the evidence that Arias failed her polygraph examination did not establish that defendants did not commit the crimes charged. However, the polygraph evidence was important to assist the factfinder in assessing the credibility of one of the State's key witnesses. Unlike in *McDavitt,* here the reliability of the polygraph test results was not important. It was Arias's belief that the polygraph test results revealed she had not told the truth in her second statement that was crucial. It was apparent that Arias believed she needed to change her story for the State to accept her statement and to agree to offer her a plea agreement. We hold that the trial court erred in denying defen-

dants the right to cross-examine Arias concerning the polygraph test results, not because those results were reliable, but because the test results caused Arias to change her statement.

## IV.

We must now determine whether the trial court's failure to permit defendants to cross-examine Arias with the polygraph test results was harmless error. We will disregard "[a]ny error or omission [by the trial court] ... unless it is of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2. "[T]he same ultimate standard applies whether the error was objected to below or whether the error was first claimed upon appeal." *State v. Macon,* 57 *N.J.* 325, 337–38, 273 *A.*2d 1 (1971). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.*2d 705, 710–11 (1967).

Although defendants were not permitted to refer to the polygraph test results, they were permitted to elicit testimony from Arias that when she was confronted with evidence that her statements were not true, she gave a different sworn statement implicating herself. The jury was told that something happened between the time Arias gave her statement the morning of and her later statement on September 4, 2001, that revealed she was not telling the truth. Moreover, during cross-examination defendants were able to establish that Arias had not changed her story because she could "live with the lie no more."

Beyond that, the evidence from other eyewitnesses of defendants' participation in the assault on Grant was substantial. Gentile testified that Castagna kicked Grant and was swinging something in her hand during the assault. Baez reported that Castagna kicked Grant and used a long object, and that Morales dropped the block, and D'Amico kicked Grant. Several witnesses placed D'Amico in the passenger seat of the Jeep, and Mr. Mojica testified that the person in the passenger seat opened the

door, striking Grant. D'Amico testified that he kicked Grant and demonstrated the manner in which he kicked him. In addition, the jury rejected Arias's testimony that Castagna wielded a metal rod because the jury found Castagna not guilty of the charges related to using or possessing a weapon.

In short, the trial court permitted defendants to cross-examine Arias concerning the change in her statement and that she had been confronted with evidence that she was not being truthful. The only evidence on this issue that the jury did not receive was that it was the results of a polygraph test that had caused Arias to change her statement. Based upon our review of the record at trial, we are convinced that the failure to permit defendants to cross-examine Arias about the results of the polygraph test was harmless beyond a reasonable doubt.

## V.

The State also challenges the Appellate Division's conclusion that D'Amico received ineffective assistance of counsel. "Our courts have expressed a general policy against entertaining ineffective-assistance of counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." *State v. Preciose*, 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992); *see State v. Allah*, 170 *N.J.* 269, 787 *A.*2d 887 (2002). However, when the trial itself provides an adequately developed record upon which to evaluate defendant's claims, appellate courts may consider the issue on direct appeal. *Allah, supra*, 170 *N.J.* at 285, 787 *A.*2d 887.

In *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987), this Court adopted the standard articulated by the United States Supreme Court for evaluating ineffective assistance of counsel claims. In *Strickland v. Washington*, 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984), the Court created a two-prong test for evaluating claims of ineffective assistance of counsel. Under the test, a reviewing court must determine: (1) whether counsel's performance "fell below an objective standard of

reasonableness," *id.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, and if so, (2) whether there exists a "reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different," *id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

The first prong of the test is satisfied by a showing that counsel's acts or omissions fell "outside the wide range of professionally competent assistance" considered in light of all the circumstances of the case. *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. Therefore, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. To rebut that strong presumption, a defendant must establish that trial counsel's actions did not equate to "sound trial strategy." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95 (quoting *Michel v. Louisiana,* 350 *U.S.* 91, 101, 76 *S.Ct.* 158, 164, 100 *L.Ed.* 83, 93 (1955)). In evaluating a defendant's claim, the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 694.

Thus, an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during the trial. *State v. Coruzzi,* 189 *N.J.Super.* 273, 319–20, 460 *A.*2d 120 (App.Div.), *certif. denied,* 94 *N.J.* 531, 468 *A.*2d 185 (1983). The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt. *State v. Marshall,* 123 *N.J.* 1, 165, 586 *A.*2d 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). As a general

rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal "except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial." *State v. Buonadonna*, 122 *N.J.* 22, 42, 583 *A.2d* 747 (1991) (quoting *State v. Dennis*, 43 *N.J.* 418, 428, 204 *A.2d* 868 (1964)); *see also State v. Savage*, 120 *N.J.* 594, 617, 577 *A.2d* 455 (1990); *State v. Davis*, 116 *N.J.* 341, 357, 561 *A.2d* 1082 (1989), *superseded by constitutional amendment on other grounds, N.J. Const.* art. I, ¶ 12, *as stated in State v. Cruz*, 163 *N.J.* 403, 411, 749 *A.2d* 832 (2000).

The second prong is satisfied by a defendant's showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.2d* at 698. The error committed must be so serious as to undermine the court's confidence in the jury's verdict or the result reached. *Ibid.*

D'Amico contends that the following passage during his trial counsel's opening statement was clear evidence of ineffective assistance of counsel.

But the bottom line is, and it's not easy to say it, *my client is a criminal. He dishonored the badge. You are going to find him guilty of probably one or maybe two counts of misconduct and or obstruction of justice. My client is going to testify that he assaulted Bennett Grant.* He kicked him. He didn't stomp him. He didn't cause his death. We'll talk about that later. He kicked him once in the back of his leg or by his butt. He's done as a police officer. He's done as a citizen. *He's a criminal. He is going to get on the stand and take responsibility for his acts.* You will judge what crimes he is guilty of. So you can forget about the presumption of innocence or the assumption of innocence on the misconduct *because he is guilty* of which count you will determine or which counts, maybe even multiple counts.

[ (Emphasis added).]

D'Amico claims that he was deprived of effective assistance of counsel because of counsel's failure to recognize that his comment that D'Amico assaulted the victim established an element of the offense of aggravated manslaughter. In contrast, the State argues that trial counsel's opening statement and the decision that

D'Amico would testify was a strategic decision adopted because it was clear that a number of witnesses would implicate D'Amico in the assault and obstruction of justice charges.

D'Amico was indicted for murder. If convicted, he would have been exposed to a sentence of between thirty years and life imprisonment. *N.J.S.A.* 2C:11–3. He was also indicted for aggravated manslaughter, two counts of official misconduct, and obstruction of justice.

Defense counsel was aware that the State would present substantial evidence against D'Amico on all of the charges. There were numerous eyewitnesses, some were co-defendants and others were not, who would testify that D'Amico kicked Grant. Although defense counsel could have used less strident language in admitting D'Amico's involvement in the incident, on this record we do not conclude that defense counsel's high-risk strategy of admitting D'Amico's guilt to lesser-included offenses in the hope that it would enhance D'Amico's credibility, eventually leading to a not guilty verdict of the most serious offense, was *prima facie* evidence of ineffective assistance of counsel.

Beyond that, we cannot determine whether D'Amico had agreed in advance with defense counsel's trial strategy to admit D'Amico's guilt to certain offenses to gain credibility with the jury in an attempt to earn a not guilty finding on the first-degree murder charge, and whether D'Amico agreed that counsel should inform the jury that he would testify. If D'Amico had agreed in advance with defense counsel's trial strategy, then defense counsel's conduct was not plainly ineffective. The answers to these questions lie outside the record and must await a post-conviction relief petition. It was error to conclude that D'Amico satisfied the *Strickland* test to establish he was denied effective assistance of counsel.

## VI.

We reverse the Appellate Division judgment and reinstate the convictions and sentences of defendants Castagna and D'Amico.

Justice RIVERA–SOTO, *concurring in the result.*

In this appeal, we address two separate issues. First, we address the claim by defendants Josephine Castagna and Thomas J. D'Amico that their constitutional rights were infringed when the trial court prohibited the cross-examination of a witness in respect of the results of a polygraph examination to which that witness subjected herself pursuant to her plea agreement—her contract—with the State. Second, we address D'Amico's claim that his trial counsel was ineffective. The Appellate Division upheld the defendants' arguments in respect of both claims and we reverse that judgment. I separately address these issues because, although I concur in the result we reach, I do so for reasons different from those expressed by the majority.

## I.

The majority concludes that "the limitation placed on defendants' right of cross-examination did not serve the interests of fairness and reliability[,]" and, hence, "the trial court erred in denying defendants the right to cross-examine Arias concerning the polygraph test results, not because those results were necessarily reliable, but because the test results caused Arias to change her statement." *Ante,* 187 *N.J.* 311–12, 901 *A.2d* 373–74 (2006). Although it condemns the trial court's actions, the majority ultimately is "convinced that the failure to permit defendants to cross-examine Arias about the results of the polygraph test was harmless beyond a reasonable doubt." *Ante,* 187 *N.J.* 313, 901 *A.2d* 374 (2006).

I agree with the final result reached by the majority that the Appellate Division's decision in respect of the evidence concerning Arias's polygraph examination cannot be sustained. But, I arrive at that conclusion through a different path. In my view, the reasoning on which the trial court based its refusal to permit defendants to cross-examine Arias on the results of a polygraph examination to which she was subjected as a condition of her plea agreement with the State was entirely correct. As the trial court

reasoned, our case law makes clear that the results of polygraph examinations are inadmissible unless "the State and defendant enter into a stipulation to have defendant submit to a polygraph test, and have the results introduced in evidence[.]" *State v. McDavitt,* 62 *N.J.* 36, 46, 297 *A.*2d 849 (1972). In addition to those limitations on the admissibility of polygraph examinations, "it must appear that the stipulation is clear, unequivocal and complete, freely entered into with full knowledge of the right to refuse the test and the consequences involved in taking it. It must also appear that the examiner is qualified and the test administered in accordance with established polygraph techniques." *Ibid.*

The answer to the question whether defendants, who were neither parties to nor intended or incidental beneficiaries of Arias's plea agreement with the State, had any standing to rely on Arias's stipulation to support the admissibility of her polygraph results in defendants' separate trial is, to me, self-evident: they do not. However, that alone does not answer the basic inquiry here. The focus must be on whether the core principles of *State v. McDavitt,* allowing for the admission of polygraph results, were observed. They too were not.

Simply said, because there is nothing in this record that shows that Arias entered her stipulation knowing that the results of her polygraph examination could be used in a trial other than her own, there is substantial doubt that, in respect of the use of those results in defendants' trial, Arias clearly, completely, unequivocally and freely entered into her stipulation. Similarly, because there was no showing that Arias was informed that her polygraph results could be used in the trial of another, there is substantial doubt that she entered into her stipulation "with full knowledge of . . . the consequences involved in taking it." *Ibid.*

The majority does not address those concerns. Instead, citing to *State v. Williams,* 184 *N.J.* 432, 444, 877 *A.*2d 1258 (2005), the majority focuses on defendants' constitutional confrontation rights as the predicate for its intermediate conclusion that "the limitation

placed on defendants' right of cross-examination did not serve the interests of fairness and reliability." *Ante,* 187 *N.J.* 311, 901 *A.*2d 373 (2006). Following that reasoning, the majority then holds that "the trial court erred in denying defendants the right to cross-examine Arias concerning the polygraph test results, not because those results were necessarily reliable, but because the test results caused Arias to change her statement." *Ante,* 187 *N.J.* 311–12, 901 *A.*2d 373–74 (2006). Ultimately, however, the majority concludes that, in light of the sheer scope and breadth of the cross-examination of Arias afforded defendants, "the failure to permit defendants to cross-examine Arias about the results of the polygraph test was harmless beyond a reasonable doubt." *Ante,* 187 *N.J.* 313, 901 *A.*2d 374 (2006).

The better view, it seems to me, lies in the proviso the majority acknowledges: "the right of confrontation is not absolute." *Ante,* 187 *N.J.* 309, 901 *A.*2d 372 (2006) (citing *State v. Smith,* 158 *N.J.* 376, 384, 730 *A.*2d 311 (1999)). *See also State v. Williams,* 184 *N.J.* 432, 444, 877 *A.*2d 1258 (2005) ("[T]he rights to confront State witnesses and to present favorable witnesses are 'not absolute, and may, in appropriate circumstances, bow to competing interests.'") (citing *State v. Budis,* 125 *N.J.* 519, 531, 593 *A.*2d 784 (1991)). Because it renders irrelevant those bedrock principles, I do not subscribe to the unfortunately limitless view that "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." *State v. Garron,* 177 *N.J.* 147, 171, 827 *A.*2d 243 (2003). As a practical matter, there are everyday limits to the use and admissibility of evidence, and those limits do not *ipso facto* engender questions of constitutional dimension. Thus, we regularly sustain the assertion of testimonial privileges even though they "often undermine the search for truth in the administration of justice[.]" *State v. Szemple,* 135 *N.J.* 406, 413, 640 *A.*2d 817 (1994) (citation and internal quotation marks omitted). For example, the blanket claim that rape shield laws, laws that protect a victim from the presentation or introduction of evidence of the victim's previous sexual conduct, *see N.J.S.A.* 2C:14–7, *per se* infringe on a defen-

dant's constitutional confrontation rights has been rejected. *State v. Cuni,* 159 *N.J.* 584, 600, 733 *A.*2d 414 (1999) (adopting, for rape shield law purposes, two-step analysis of relevance versus balance of probative value against prejudicial effect).

We recently framed the issue thusly: "Those constitutional rights [to confrontation and compulsory process], however, may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process, such as established rules of evidence and procedure designed to ensure the fairness and reliability of criminal trials." *Garron, supra,* 177 *N.J.* at 169, 827 *A.*2d 243 (citations and internal quotation marks omitted). I entirely concur with that core concept. *Garron,* however, creates an exception that, in my view, swallows that rule whole. According to *Garron,*

> when the mechanistic application of a state's rules of evidence or procedure would undermine the truth-finding function by excluding relevant evidence necessary to a defendant's ability to defend against the charged offenses, the Confrontation and Compulsory Process Clauses must prevail. The competing state interest served by barring proposed evidence must be closely examined when the denial or significant diminution of the rights of confrontation and compulsory process calls into question the ultimate integrity of the fact-finding process.
>
> [*Ibid.* at 169–70, 827 *A.*2d 243 (citations and internal quotation marks omitted).]

Based on that analysis, *Garron* concluded that, "[s]tated a different way, if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." *Ibid.* at 171, 827 *A.*2d 243. I cannot agree with so sweeping a pronouncement.

It is impossible to envision a set of circumstances where the assertion of any substantive, procedural or evidentiary obstacle to the introduction of evidence does not "undermine the truth-finding function" of a trial. As such, that standard, standing alone, is meaningless. When, as here, we are called on to determine whether a trial judge's determination as to the admissibility of trial proofs, the time-honored and far better standard we apply is whether the trial court abused its discretion, a standard embodied in *N.J.R.E.* 403 ("[R]elevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a)

undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.").

The application of that standard here leads to the conclusion that it was not error for the trial court to refuse defendants' application to cross-examine Arias in respect of her polygraph examination results or to permit the testimony of the polygrapher who administered Arias's polygraph examination. Using the balancing test usually required of it, the trial court determined that defendants' proffered evidence was inadmissible. I see no basis upon which to conclude that the trial court's determination constituted an abuse of discretion. Hence, I see no need to engage in the harmless error analysis on which the majority relied.

## II.

I wholly concur with the majority's view that the Appellate Division erred when it "conclude[d] that D'Amico satisfied the *Strickland* test to establish he was denied effective assistance of counsel." *Ante,* 187 *N.J.* 316, 901 *A.2d* 376 (2006). However, to the extent the majority "cannot determine whether D'Amico had agreed in advance with defense counsel's trial strategy to admit D'Amico's guilt to certain offenses to gain credibility with the jury in an attempt to earn a not guilty finding on the first-degree murder charge," or "whether D'Amico agreed that counsel should inform the jury that he would testify[,]" *ante,* 187 *N.J.* 316, 901 *A.2d* 376 (2006), I cannot join its reasoning. Unlike the majority's conclusion that "[t]he answers to these questions lie outside the record and must await a post-conviction relief petition[,]" *ante,* 187 *N.J.* 316, 901 *A.2d* 376 (2006), I find the record in this case sufficient to dispense entirely with D'Amico's ineffective assistance of counsel claim. I would find that D'Amico's challenge fails both prongs of the *Strickland/Fritz* test, that is, whether counsel's performance "fell below an objective standard of reasonableness," and if so, whether there exists a "reasonable probability that, but for counsel's unprofessional error, the result of the proceeding

would have been different[.]" *Strickland v. Washington*, 466 *U.S.* 668, 687–88, 694, 104 *S.Ct.* 2052, 2064, 2068, 80 *L.Ed.*2d 674, 693, 698 (1984); *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting *Strickland* standard for ineffective assistance of counsel claims).

The unadorned fact of the matter is that, at the time of Grant's brutal and unspeakable murder, D'Amico was a certified and authorized police officer in this State and, in any event, he certainly was not free to join what could only be described charitably as a lynch mob. On the contrary, D'Amico's clear sworn duty lay in standing between the victim and that murderous mob. D'Amico chose to soil and dishonor the uniform he should have been proud to wear and, instead, elected to willingly participate in what the Appellate Division understatedly described as "the indisputably barbaric acts that brought about the destruction of [a] human life[.]" *State v. Castagna*, 376 *N.J.Super.* 323, 330, 870 *A.*2d 653 (App.Div.2005).

That context created the challenge D'Amico's trial counsel squarely faced: the Herculean and ultimately impossible task of justifying how a police officer could so shamelessly abandon his sworn duty, join with a murderous mob in attacking a single victim, by his own admission kick a defenseless prone man, and enable others to crush the victim's skull with a twenty-five pound Belgian block. In my view, D'Amico's counsel faced that challenge in the only practical and credible way he could: he tried valiantly to divert the jury from the more gruesome consequences of D'Amico's actions and, because of their significantly lesser penal consequences, he sought to turn the jury's focus to D'Amico's failure to act as his official position then required.

When properly framed, it simply cannot be said that the performance of D'Amico's counsel "fell below an objective standard of reasonableness," or that there was a "reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different[.]" *Strickland v. Washington, supra; State v. Fritz, supra.* Therefore, I would not defer consideration

of D'Amico's ineffective assistance of counsel claim to another day. I would hold that the record in this case is sufficient to conclude that D'Amico's ineffective assistance of counsel claim is utterly without merit.

### III.

Although I concur with the majority's ultimate conclusions that reverse the Appellate Division and reinstate defendants' convictions, I would reach those results by the means I have described: sustaining, under the abuse of discretion standard, the trial court's refusal to admit either the results of Arias's polygraph examination or the testimony of the polygrapher, and determining that D'Amico's claim of ineffective assistance of counsel is without merit and does not survive this appeal.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices LaVECCHIA, ZAZZALI, WALLACE, and RIVERA-SOTO—5.

*Opposed*—None.