# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0643-24

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JONATHAN E. PEREZ, a/k/a
JONATHAN PEREZ,

      Defendant-Appellant.

---

Submitted December 8, 2025 – Decided January 23, 2026

Before Judges Walcott-Henderson and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Indictment No. 23-04-0275.

Law Offices of Jonathan F. Marshall, attorneys for appellant (Jeff Thakker, of counsel; William E. Wackowski, on the briefs).

Jeffrey H. Sutherland, Cape May County Prosecutor, attorney for respondent (James E. Moore, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jonathan E. Perez appeals from a judgment of conviction after a jury found him guilty of two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) and N.J.S.A. 2C:14-2(a)(2)(a); second-degree endangering the welfare of a child by a caretaker, N.J.S.A. 2C:24-4(a)(1); and second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4), involving his stepdaughter, D.T.[1] Having considered the arguments in light of the record and applicable legal principles, we affirm.

I.

In April 2023, a Cape May County grand jury returned an indictment against defendant charging him with multiple offenses, which resulted in final charges against defendant under the above criminal statutes. The matter proceeded to trial in April 2024. The jury convicted defendant on all counts. In August 2024, the court denied defendant's motion for a new trial and imposed an aggregate sentence of thirty years' imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

The following facts were adduced from the evidence and testimony at trial.

---

[1] We use initials or pseudonyms for certain individuals referenced in this opinion to protect the confidentiality of the victim. R. 1:38-3(d)(10) and (11).

In 2010, D.T.'s mother D.A. and defendant met in New York at a homeless shelter for women and children.  At the time, D.T. lived there with her mother, and defendant was employed there.  Defendant had been involved in D.T.'s life since "she was in diapers."  Around June 2011, D.A. and defendant started dating and moved in together.  In 2013, D.A. and defendant shared a daughter, K.P., and in 2016 moved their family to Woodbine.  They got married in 2017.  D.A. and defendant both worked as correction officers.  They were in "sister squads" working 12-hour shifts sequential to each other.

D.T. testified at trial regarding the sexual abuse inflicted upon her by the defendant.  D.T. had informed a former boyfriend about the abuse and the boyfriend's mother informed D.A.  After D.A. confronted defendant, who denied the abuse, D.A. took D.T. to the New Jersey State Police Station in Woodbine to speak with detectives about the abuse.  At that time, she was unable to verbalize the details of what had occurred, and as a result, she was provided a pen and notepad.  D.T. was instructed to write down everything she could remember on a notepad.

At trial the following written statements of D.T. in the notepad were read aloud to the jury by Detective Danielle Mitchell, the investigating detective, and were admitted into evidence with no objection from defense counsel:

A-0643-24

He would lock the door as I was sitting on the bed at this point and he would go to the opposite side of the bed, and he would lay down and pull me by the waist and get me [to] lay down with him. Then he would slowly remove my pants and when I told him ["]to stop["] or ["]what are you doing,["] he would just tell me to shush and because I was scared, I did. And then he would put his dick inside me. And then sometimes I would try and stop him, again, he would try and get me to stay quiet and so at that point I wouldn't know what else to do so I stood quiet and let him whatever he wanted to do so it would be over quicker. And so, once he was done, I would go to the bathroom in my house and clean myself up and then I would act like nothing happened and he did the same. We acted like everything was fine. Other things he would have me do is blow jobs and he would do things to me like as it would be called, eating me out. He's done stuff like this to me for three and a half years. He would also try and pull my shirt off to squeeze by boobs and he would suck on my boobs also. When he started doing things to me, I was 11 and when my sister would knock on the door, like my little sister, [K.P.], he would say he was talking to me and tell my sister to wait. He would do all this to me while my mother was at work and afterwards would allow me to do whatever I wanted, like stay[ing] out late by myself and go to my friend's house. He would guilt trip me into doing things. He would tell me that he was lonely and stressed from work and he would ask me to do things, like positions, and ask me if he could give me cream pies. He also showed me porn and would watch it while raping me. At times, I would push him off of me and he would say things like ["]I'm al[most] there["] or say ["]shush["]. He also asked me to film porn videos with him so he can buy a house, and he said with the money he would buy me pretty much whatever I wanted. I told him no so many times that he gave up. He would ask me to do anything and

4

A-0643-24

everything you could think of. I told him once that it was rape and he told me that rape is when people were hit and thrown on the floor and he said because he didn't do that, it wasn't rape. He would give me alcohol and call me a c[**]t if I didn't drink it. He would wait for it to get me tipsy so I couldn't fight him as much. And with him doing all this to me, I would be stressed that I would drink it anyways on my own time. I would tell him the things he did to me w[ere] wrong and then he would say I thought you wanted to. After I told him no as a response, he would apologize, say he wouldn't do it again but then a later day would repeat his actions. And sometimes I would tell him to leave my shirt be and stop trying to lift it up. He would tell me I'm killing his mood and get mad to make me feel bad. He would act like my dad when he had to but then he would do all this to me. One day I asked him if he would do what he did to me to my sister. He said, "I'm not answering that." I said answer my question and then he said again, "I'm not answering that." It went back and forth like that about three times until I yelled at him answer my f[***]ing question. Then he stated firmly that he is not answering that. So, by that, I had gotten my answer. Another time I had asked him why he had done this to me, he said "he thinks it's because his cousin, cousin had done it to him and because I felt bad, didn't question it." But now it seems like he told me all that just so I would continue keeping my mouth closed about it. Overall, he had manipulated and guilt tripped me into doing thing[s].

After meeting with investigators and providing a written statement at the police barracks, D.T. was taken to the Cape Regional Medical Center where she was evaluated and a rape kit was taken. She was examined and background information was taken by Nurse Lynne Rybicki who also prepared the rape kit.

5

Later, D.T. was escorted to the Cape May Child Advocacy Center and interviewed by Detective Mitchell. While D.T. was being interviewed by Detective Mitchell, D.A. was interviewed by the Division of Child Protection and Permanency and law enforcement. After the interview, D.A. consented to a search of their residence to obtain evidentiary materials. Particularly, evidence obtained from the residence included the sexual bondage harness described by D.T. and her mother.

At trial, a New Jersey State Police forensic expert testified concerning DNA testing of the harness. The expert testified that three DNA contributors were found on the harness buckle, and four contributors were found on the harness pad. Regarding the DNA profile for the buckle, the expert found, "it would be impossible for one of the three to be [D.T.]." Regarding the DNA profile from the pad, the expert testified she proposed a likelihood ratio under two different hypotheses. The first being that the mixture of DNA came from defendant, D.A., D.T., and an unknown individual. The second hypothesis proposed the mixture comprised of defendant, D.A., and two unknown individuals, excluding D.T. The expert testified the likely ratio of the DNA profile containing D.T.'s DNA was "7,500 times more likely to have occurred"

than without her.  The expert concluded this established "moderate support" that D.T. was one of the contributors to the DNA mixture on the pad.

Nurse Rybicki was also called by the State as a witness.  When asked to read the report and corresponding notes she contemporaneously prepared while examining D.T., she testified D.T. named "Jonathan Edgar Perez" as her abuser and his title was "stepdad, because a dad wouldn't do this . . . ."  She also testified "[t]he patient reports assault started around age eleven.  I did not pursue the issue with other incidents.  Patient reports the stepfather—and they are my words; I did not pursue the issue of other incidents."

D.T. also testified at trial and stated she was eleven years old the first-time defendant sexually assaulted her in the bathroom of their home.  The next incident, which also occurred when D.T. was eleven, involved defendant asking her to lay with him on his bed and give her a hug, holding her there when she asked to leave, and persistently asking her to put a yellow and black razor into her vagina.  When she told him she did not understand what he meant, he made her lie down on the bed and did it himself.  D.T. testified that defendant used the razor in this manner a "handful of times," and then "when eventually [she] got used to it and it didn't hurt anymore then that's when he went from the razor to using his penis."  D.T. testified that this pattern occurred on a nearly daily

7                                                    A-0643-24

basis during the COVID-19 quarantine. During certain incidents, defendant would hold his phone in front of D.T. so she could view pornographic videos that he was playing on the phone.

In addition to these incidents of vaginal penetration, D.T. testified defendant attempted to penetrate her anally against her will several times as well, beginning when she was in seventh grade. When asked on direct examination why she did not tell her mother about the ongoing assaults, D.T. testified that defendant told her he was giving her "experience at an early age," and that "any other girl would be lucky, would be happy to be in your position right now."

Defense counsel cross-examined D.T. on several issues, including her conversation with Nurse Rybicki and her written journal entries prepared during her interview with Detective Mitchell. Specifically, defense counsel pressed D.T. on whether she had been untruthful in her statements to Nurse Rybicki and, if so, the reasons why. Similarly, defense counsel questioned D.T. on the veracity of her written statements during her interview with Detective Mitchell, exploring discrepancies between D.T.'s written statement and her verbal expressions to Detective Mitchell, particularly regarding D.T. 's alcohol use and

8

the positioning and recording capabilities of surveillance cameras within the house.

In addition, both Detective Mitchell's and Nurse Rybicki's testimonies were subject to cross-examination, which included Detective Mitchell's testimony regarding the notepad and Nurse Rybicki's testimony regarding her examination of D.T., including her statements concerning defendant.

At the conclusion of trial, the jury returned a verdict finding defendant guilty of both counts of first-degree aggravated sexual assault, second-degree endangering the welfare of a child by a caretaker, and second-degree sexual assault.

On appeal defendant raises the following points:

POINT I

WHAT D.T. WROTE ON THE LEGAL PAD WAS INADMISSIBLE HEARSAY; IT WAS ADMITTED BECAUSE OF INEFFECTIVE ASSISTANCE OF COUNSEL.

POINT II

WHAT D.T. SUPPOSEDLY SAID TO NURSE RYBICKI WAS INADMISSIBLE HEARSAY.

A-0643-24

## II.

Where a party raises an objection to evidence for the first time on appeal, the plain error standard applies that requires that the error must "clearly [be] capable of producing an unjust result. . . ." R. 2:10-2; State v. Santamaria, 236 N.J. 390, 404 (2019) (citing R. 2:10-2). Harmless error analysis requires an examination in light of the overall strength of the State's case. State v. Clark, 251 N.J. 266, 287 (2022).

Evidentiary rulings are reviewed for abuse of discretion. State v. Prall, 231 N.J. 567, 580 (2018); State v. Medina, 242 N.J. 397, 411-12 (2020). Hearsay is defined as an out-of-court statement offered for the truth of the matter asserted, unless it falls within a recognized exception. N.J.R.E. 801(c); N.J.R.E. 802.

For statements by sexual assault complainants under age twelve, N.J.R.E. 803(c)(27), the "tender years exception," applies if requirements of notice, reliability findings and either testimony of the child or corroborating evidence are met. State v. Michaels, 136 N.J. 299, 316-19 (1994). For statements to medical providers, N.J.R.E. 803(c)(4) admits only those made in good faith for, and reasonably pertinent to, medical diagnosis or treatment. State v. Gonzalez, 249 N.J. 612, 635-6 (2022).

A-0643-24

Claims of ineffective assistance of counsel are governed by the two-prong test of Strickland v. Washington, 466 U.S. 668, 687 (1984), as adopted by State v. Fritz, 105 N.J. 42, 58 (1987): (1) counsel's performance must fall below an objective standard of reasonableness, and (2) there must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. On direct appeal, such claims are typically reserved for post-conviction relief proceedings unless the record is sufficiently developed. State v. Preciose, 129 N.J. 451, 459-60 (1992); see also State v. Castagna, 187 N.J. 293, 313 (2006).

We first address defendant's argument that D.T.'s written statement constituted inadmissible hearsay and did not qualify for any exception, specifically noting it was created when D.T. was fourteen and that no N.J.R.E. 104(a) hearing was held to determine its trustworthiness. The record confirms that D.T. was over the age threshold for the hearsay exception set forth in N.J.R.E. 803(c)(27). The State does not seriously contest D.T.'s age, arguing instead that defense counsel cross-examined D.T. on the discrepancies and inconsistencies in the statement for strategic reasons and that any error was harmless considering the other overwhelming admissible evidence proving defendant's guilt.

11

We conclude D.T.'s written statement, which defense counsel did not object to, was hearsay. The statement did not satisfy the prerequisites of any hearsay exception and specifically did not satisfy the hearsay exception under N.J.R.E. 803(c)(27) because D.T. was over the age of thirteen when she made the statement. State v. D.G., 157 N.J. 112, 125-27 (1999).

Defendant further contends Nurse Rybicki's testimony was inadmissible hearsay as it did not satisfy the medical diagnosis/treatment exception at N.J.R.E. 803(c)(4), as the examination was conducted in a forensic evidence-gathering context, not for treatment. We agree with defendant that the statements Nurse Rybicki relayed to the jury do not fit squarely within the above hearsay exception because the statements were not offered by the State to show a medical diagnosis or treatment, as the examination of D.T. was for forensic purposes.

Nevertheless, based on our review of the record, we conclude the admission of D.T.'s written statement and the testimony of Nurse Rybicki lacked sufficient prejudice to overturn the jury verdict under the plain error standard as this evidence was not "clearly capable of producing an unjust result" in the context of the record as a whole. At trial, D.T. was subject to extensive cross-examination regarding her direct testimony, her statements to Nurse Rybicki and

12

the contents of her written statement. Defense counsel also cross-examined Nurse Rybicki and Detective Mitchell, thoroughly testing the accuracy and credibility of their testimony. In addition, defense counsel affirmatively utilized D.T.'s written statement on cross-examination to discredit D.T.'s version of the incidents, pointing to inconsistencies between her testimony and other evidence when compared to the representations in her written statement.

At trial, the State called sixteen witnesses and produced significant evidence against defendant including: (1) forensic evidence supporting D.T.'s DNA on the sexual bondage harness pad; (2) defendant's internet search history which included stepfather/stepdaughter fantasy pornography; (3) photographs of D.T.'s genitalia which showed redness; (4) numerous inculpatory text messages sent by defendant to D.T; and (5) direct testimony from D.T. describing in detail the sexual assaults.

Our Court has held the admission of hearsay evidence may be found to constitute harmless error. State v. Kemp, 195 N.J. 136, 156 (2008); see also State v. Bankston, 63 N.J. 263, 272-73 (1973). When considering the overwhelming evidence outside of the challenged hearsay statements, we conclude the admission of the hearsay could not produce an unjust result.

We now turn to defendant's assertion that trial counsel was ineffective for (1) failing to object to the hearsay evidence; and (2) failing to request an N.J.R.E. 104 hearing be held related to D.T.'s written statement. We determine defendant's claim is not based solely on matters apparent in the trial record and include facts outside the record, possibly concerning trial counsel's strategic choices concerning this evidence. Under these circumstances, we have previously held a review on direct appeal is not appropriate as the record does not permit a fair evaluation. Castagna, 187 N.J. at 313.

Although defendant contends his trial counsel's performance may have been less than optimal, particularly in failing to invoke objections or requesting a hearing to determine the admission of the challenged evidence, we conclude a full review of the record evidence supporting his ineffective assistance of counsel claim is more appropriately determined through a PCR petition and not through this direct appeal. In a PCR proceeding, trial counsel can be notified and respond to defendant's allegations, including, but not limited to, communications with defendant and any strategic decisions made at pre-trial proceedings or trial. A post-conviction relief proceeding will permit an expanded factual record to be developed that can more appropriately address the claimed ineffective assistance of counsel assertions.

14

To the extent we have not specifically addressed any of defendant's remaining legal arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

15

A-0643-24