# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0991-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARK F. HAILSTORK,

     Defendant-Appellant.

_____

     Submitted October 1, 2020 – Decided September 14, 2021

     Before Judges Fuentes, Whipple and Firko.

     On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-04-0674.

     Helmer, Conley & Kasselman, PA, attorneys for appellant (Patricia B. Quelch, of counsel and on the brief).

     Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Lisa Sarnoff Gochman, of counsel and on the brief).

PER CURIAM

Defendant Mark F. Hailstork was tried before a jury over a three-day period in May 2019 and convicted of second degree sexual assault, N.J.S.A. 2C:14-2c(1), and fourth degree criminal sexual contact, N.J.S.A. 2C:14-3b. The trial judge sentenced defendant to an aggregate term of nine years subject to an eighty-five percent period of parole ineligibility and three years of parole supervision under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant sexually assaulted T.W.,[1] a Licensed Practical Nurse (LPN) who was employed by a private company that provides twenty-four-hour personal care for developmentally disabled adults who reside in a private residential complex. Defendant worked as T.W.'s supervisor and had the authority to establish her work schedule. The State argued to the jury that defendant used his position as T.W.'s supervisor to create the opportunity to work with her during the overnight shift at an apartment occupied by two developmentally disabled men. Defendant used this isolated time and place to sexually assault T.W. In this appeal, defendant raises several arguments attacking the fairness of the trial and questioning the sentence imposed by the trial court as excessive. We reject defendant's arguments and affirm.

---

[1] We identify the victim by her initials to protect her privacy. R. 1:38-3(c)(12).

A-0991-19

T.W. was the State's first witness. At the time of trial on May 15, 2019, she was employed as an LPN who provided at-home, inpatient care for developmentally disabled children. In February 2015, T.W. worked as an LPN for an agency that operated a federally funded low-income residential apartment complex that provided at-home care for developmentally disabled adults. The personal care services were provided by LPNs and direct support personnel (DSP). The DSPs provided the disabled residents grooming services and other personal needs. However, DSPs were not permitted to provide services that required medical training. LPNs performed medically-related services such as injections, flushing a catheter, or feeding a resident via gastrostomy tube.

T.W. worked with two disabled adults who resided in a two-bedroom apartment. They each had their own bedroom and shared the apartment's common areas, such as the kitchen, living room, and bathroom. T.W. testified "during the week, the patients would go to school," and when they returned home, "those are the nurse and the DSP hours. That was the time that we would provide care. On the weekends it was [twenty-four-hour] care." T.W. was initially hired on a part-time basis. However, she soon discovered an internal posting announcing a full-time position for an LPN to work overnight shifts

from 11:00 p.m. to 9:00 a.m.  She applied and was hired to work on a full-time basis.

T.W. described the apartment's two residents as needing "100 percent total care."  They relied on the DSP and LPN for all their basic needs, "every aspect of their life depended on staff."  They were also unable to ambulate or communicate verbally.

Although she worked with a DSP during overnight shifts, there was no consistent work schedule.  As T.W. explained:

> Sometimes the DSP would vary depending on who called out.  Same with the nurses.  Sometimes the nurses would call out.  Sometimes DSPs would call out, and they would provide someone or . . . we were told we had to provide our own coverage, so sometimes we were good at it.  Sometimes we weren't so successful.  So then upper management would step in . . . . and try to see who would be able to work the shift.

T.W. was scheduled to work the overnight shift on October 18, 2015.  On that date, she arranged to switch her shift with another nurse because she wanted to attend her son's football game that morning.  She agreed to work a double shift, starting at 3:00 p.m. until 9:00 a.m. the following day.  During the daytime shift, she worked with a DSP she identified as "Donald."  T.W. described the type of services she and Donald provided the two residents:

A-0991-19

We provided dinner, cooked dinner, fed them, bathed them, got them ready for bed, medication, did everything essentially to get them prepared for bed. Spend time with them, charting, anything pertaining to nursing, that's what we did.

Q. Is there paperwork involved, too?

A. Yes.

Q. Just tell us a little bit about that.

A. You had to make sure the MAR was correct, so the MAR is the Medication Administration Record. So anytime we gave medication, we would have to write our initial[s] and sign it so that they knew that we gave the medication. Also, they had goals that they had to have completed. So any goals, such as music or any aspects of their care that a doctor may have ordered, that was something that we had to make sure that we did. . . . Also, laundry, housework, cooking, cleaning, changing their sheets, wound care, essentially anything and everything that they needed was done.

At approximately 9:00 p.m. that night, T.W. received a telephone call from defendant who told her he would be working with her that evening as the DSP. This seemed odd to her because she was under the impression defendant was the DSP "coordinator." T.W. testified defendant directed her to tell Donald to leave at 11:00 p.m.; he also asked her not to report this change to management. Despite the unusual nature of this request, she agreed to follow it. T.W. testified she specifically asked defendant whether a woman DSP, with whom she had

5

A-0991-19

worked at least once before, was available to work this night shift. According to T.W., defendant told her there were too many DSPs earning overtime pay, so "the job wouldn't allow for any other DSPs to come in."

This night was the first time T.W. had worked an overnight shift. Defendant telephoned T.W. a second time to ask her if she wanted anything to eat from White Castle. This prompted the prosecutor to ask T.W. if she knew defendant. She responded:

> I had known him from coming in and out of the apartment. He was a brother to one of the coworkers, a young lady I had went to school with.
>
> Q. Okay. Had you ever -- you had seen him at work before?
>
> A. Yes.
>
> Q. Had you ever worked a shift with him before?
>
> A. No.

Defendant arrived at approximately 12:45 a.m., nearly two hours after the day-shift DSP had left. Their initial interactions were uneventful. T.W. sat on the couch doing "paperwork" and defendant sat in the kitchen and ate. As T.W. described it, they were "chatting about basically everything . . . [and trying to] get a feel for one another because we had never really worked together . . . discussing family, relationships, coworkers." At this point, the prosecutor

A-0991-19

showed T.W. a series of photographs that depicted the layout of the inside of the apartment. A collection of twelve photographs were admitted into evidence as a State's exhibit and published to the jury via PowerPoint without objection.

T.W. testified that at approximately 3:00 a.m., defendant mentioned he was going to take a shower and asked her to turn up the thermostat. Defendant thereafter stepped out of the apartment and returned with a bag containing his clothing. Defendant then asked T.W. to show him how to turn up the heat using the thermostat located near the bedroom of one the residents. At this same time, T.W. heard the resident who occupied that bedroom make "a noise." Defendant, who "was in that vicinity[,] . . . ushered [T.W.] to come in the room." T.W. responded without hesitation because it was well known that the resident "was at risk for aspiration, as well as seizures."

The bedroom was illuminated only by the light emanating from the television. As soon as T.W. walked into the bedroom, she saw defendant standing "in close proximity" to the resident's bed. She approached the bed, saw the resident was "smiling," and "figured he was okay . . . . " T.W. testified that at this point, defendant

> grabbed me around my waist and he grabbed me by my head and he took my neck . . . and started to try and kiss on my neck, and as I'm like trying to get him off of me, he was trying to take my belt, because I had on a

sweater that had a leather belt on. I had on a turtleneck, a black turtleneck, a belted sweater and jeans and my slippers, and he tried to remove the belt and he kept trying to force his hands down my pants.

. . . .

I tried to get out of the room. Like I was pushing him off of me and trying to go into the hallway that led like by the thermostat, and he pushed me up against the thermostat and tried to do the same thing, and I'm like pushing him off of me as he –

Q. Did you say anything at that point?

A. I was telling him to stop.

. . . .

I was basically trying to get him off of me and trying to diffuse the situation at the same time, so that I can like get out of there. As soon as like I got him to stop, he went into the bathroom to go take a shower; and as soon as I heard the shower water come on, I ran to my phone and I texted my coworker to tell her what he had done to me.

[(Emphasis added).]

The coworker T.W. texted, a woman identified here as J.H., was employed at the time as a DSP; the two women had regularly worked together in that same apartment on Fridays. The content of the text message dated October 19, 2015, and time-stamped 3:35 a.m., was read aloud to the jury verbatim. It states: "I need to talk to someone. Mark is here at work with me and being very hands

8

on. If anything should happen, I'm telling you please save this text. He's in the shower. Text you tomorrow."

T.W. testified defendant got out of the shower wearing only "a green towel and black Nike flip flops." She was seated on the couch. After drying the bathroom floor with a comforter, he sat down in the kitchen and repeatedly asked T.W. to come over and dry his back. She responded "no" several times. According to T.W., she eventually went to the kitchen "[b]ecause [he] assertively . . . told me to . . . come in there . . . and I was scared, and so I got up and went." She testified that as soon as she reached the kitchen, he pushed her up against the cabinet; she pushed him off and returned to the couch.

> Q. Okay. Why did you go and sit on the sofa?
>
> A. Because I was scared at that point. I didn't want him to touch me anymore and I just, I felt safe on the sofa, and I didn't want to run out the house because I was scared that he would follow me, so I just sat on the sofa.
>
> Q. What were you feeling at this point?
>
> A. I was anxious. I was scared. A lot of thoughts just running through my head. I didn't know what to do at that point in time, so I just tried to keep my composure and not let him know that I was scared.

Notwithstanding T.W.'s repeated rejections, defendant's sexual harassment remained unrelenting and his tactic of physical intimidation

9

undeterred. As night slowly gave way to dawn, T.W. continued to deploy the only defense that had thus far kept defendant physically away from her; she continued to sit on the couch and kept the conversation going, focusing mostly on the paperwork and the job. Unfortunately, this tactic of distract and delay ultimately proved to be ineffective. In T.W.'s own words, the conversation eventually "went from light to really dark."

> I kept telling him how tired I was . . . handing him the paperwork, and then he began the banter I will let you go to sleep if you let me taste it, I will let you go to sleep if you let me stick the head in; and again, I kept telling him no. He kept asking me why I kept changing the subject, because I kept trying to change the subject so he wouldn't keep talking to me about these things and he just kept on.
>
> [(Emphasis added).]

At approximately 6:00 a.m., T.W. wanted to text J.H. again. She told defendant that she was hungry and asked him to go to McDonald's and buy her breakfast. Her attempt to get him to leave was not only ineffective, but it aroused defendant and prompted him to escalate his sexual intimidation tactics. Up to this point, T.W. had been seated in the corner of the large couch and used a blanket to cover herself. She testified defendant turned off all the lights in the apartment "because I had refused to move from out of the corner." As T.W. described it, defendant's campaign of harassment and intimidation continued.

10

A-0991-19

He sat down next to me. He asked me what would I do if he started to remove his clothing, and I just shook my head, like, at one point in time because I kept trying to fall asleep. He asked me do I sleep with my mouth open. And I'm just like, I wasn't really responsive to him. He sat down next to me and every time I would look over, because I was trying to ignore him, he was missing an article of clothing. He was down at one point to his black T-shirt and black underwear.

. . . .

At that point in time he scoots over closer to me and he starts trying to rub on my leg and trying to rub in between my leg, like I'm trying to push him off of me, and he's trying to rub on my leg and trying to rub in between my thighs, and I'm pushing his hand off of me; and I kept telling him like to stop, and I kept telling him I was like can you -- at one point I asked him to go turn down the thermostat because he had turned the heat all the way up, and I asked him to turn down the thermostat because it was really hot in there. I was getting sleepy and I was like just frustrated. I just wanted him away from me. So I was just saying anything to get him away from me.

[(Emphasis added).]

Faced with defendant's unrelenting sexual aggression, T.W. came up with yet another plan to defend herself. She told defendant she wanted to take a cold shower "to wake [herself] up" and quickly stepped into the bathroom and locked the door behind her. She then "turned on the shower water and . . . stood in between the toilet and the sink." Defendant immediately began knocking on the

11

A-0991-19

bathroom door while telling her he knew she was not taking a shower. T.W. testified she tried to convince him she was truly in the shower, although she was not certain whether he could hear her voice. She eventually "jumped in the shower without even thinking" with the hope of getting him "[to] stop banging on the door and bothering me."

T.W. conceded she was not thinking clearly; her actions were purely acts of desperation in response to defendant's menacing behavior, exacerbated by the nearly twenty-four hours she had been without sleep. While in the shower, she only splashed water on her face because she did not have the means of drying herself. Suddenly,

> the next thing I know is the door came open. I didn't even hear the door open. . . . The lights went out and I'm trying to see. He rips open the curtains and he takes the water, he shuts it off, and I turn back the water. I turned the water back on, and he's yelling at me at this point, telling me that I'm going to wet up the floor. So he takes the water, he shuts it off again, takes the hose, and snatches it out of out my hand.

Q. What are you saying at this point?

A. I'm screaming "Get the fuck out the bathroom."

Q. And the lights are out the whole time?

12 A-0991-19

A. Yeah, the whole house, it was dark at that point. I couldn't really see.[2]

. . . .

Q. After he turned off the water the second time, tell us about what happened.

A. At that point he grabbed me by my wrist and he's pulling me, and as I'm being pulled, I'm trying to lean back like this and he's pulling me through the house.

T.W. testified that she was nude when defendant dragged her while she screamed for him to stop. Because her feet were wet, she could not stop sliding across the floor as he dragged her through the hallway and finally forced her down, on her back, on the large couch in the living room. Although she tried to fight him off, defendant had her "pinned down with his body weight on top of [her]." As he physically overpowered her, she kept screaming at him to stop. Defendant told her, "I'm not stopping." T.W. testified she heard "a plastic sound" and concluded defendant was putting on a condom. However, she did not actually see it because the apartment was "completely dark." We do not

---

[2] T.W. testified she was surprised to discover defendant was able to open the locked bathroom door with a key. On the second day of trial, the State called Sharon Temple, who was employed by the agency as a LPN Manager from 2013 to 2017. Temple testified regulations issued by the State Division of Developmental Disabilities mandate that a key must be taped or otherwise secured over the doorframe of any bedroom, bathroom, or any other place that can be locked.

13

need to describe the graphic details of what occurred next. It is sufficient to state T.W. testified defendant penetrated her vagina with his penis.

When defendant finished, T.W. testified he "got off of me and I ran to the bathroom and I got dressed." When T.W. came out of the bathroom, she sat on the couch and defendant sat in a chair positioned at an angle from where she was seated. In response to the prosecutor's question, T.W. testified defendant said to her: "if I would have given it to him earlier, I would have been able to get some sleep." T.W. passed out and awoke at approximately 7:00 a.m. She saw defendant putting on gloves to attend to the residents, as required by agency protocol.

As T.W. began to attend to the grooming, medical, and dietary needs of the residents, she received a telephone call from Sharon Temple, her supervisor. Temple told her the bus that transports the residents to the daytime activities program was delayed and was not expected to arrive until about 9:15 a.m. She was "devastated" because this meant she "had to be there with him even longer." According to T.W., while she and defendant were each feeding one of the residents, defendant spoke to the severely disabled men, who are unable to speak, and in a jocular manner told them that T.W. "had raped him" during the night. Without objection from defense counsel, T.W. was permitted to describe

14

how she felt when she heard defendant make these comments to the two disabled residents.

> I felt like he was taunting me. And I said, I asked him -- I said you were the one on top of me and I was screaming stop. He said you didn't say no. And he said no. I said -- I referenced a stop sign, first of all. I said what do you think stop means. I was like it means don't. That means no. Don't go. And he was like no doesn't mean no in guy's language.
>
> Q. Was there some talk about Newark?
>
> A. He said -- yeah.
>
> Q. What's that about?
>
> A. He said with the stop sign, regarding the stop sign, when I referenced the stop sign meaning stop, he said in Newark that doesn't mean stop. You know, that you don't have to stop at a stop sign in Newark.
>
> Q. What was your demeanor like at this point?
>
> A. Tired, beaten down, mentally, physically. Like I was just tired. I was just mentally drained at that point. I think I was in a state of shock because I couldn't . . . I didn't know how to react, so I was just pretty numb at that point.

According to T.W., as defendant was about to leave the apartment he said: "next time you won't fight it, will you . . . ." T.W. "clocked out" from her shift around 9:40 a.m. She called her friend J.H. at 9:46 a.m. Their conversation lasted about ten minutes. Thereafter, she made two calls to two separate "rape

15

hotlines." She did not get through to the first phone number. She was able to speak to the woman who answered the second rape hotline phone number. Her cellphone records show this call lasted approximately sixteen minutes. She made these calls while driving home, which took her approximately thirty minutes. She was still speaking with the counselor from the hotline when she parked her car in the adjoining complex. She did this to avoid being seen by her youngest daughter, who always waits by the window for her arrive home from work.

T.W.'s former husband was with her youngest daughter when she arrived home. When the child ran up to greet her, she pushed her away. When her former husband asked how her day was, she merely shook her head and told him she was tired. She was too distraught to engage in ordinary conversation. She asked him to go to the liquor store "and grab me a bottle of wine" and went upstairs. The prosecutor followed up with the following questions:

Q. Was it unusual that you would drink wine that early in the morning?

A. Yeah.

Q. Okay. Why did you ask him for that?

A. Because I didn't want to think about any of this. I didn't know how to cope. I kept telling the lady from the [r]ape [h]otline I didn't know what to do. I just kept

A-0991-19

saying I don't know what to do.  I don't know what to feel.  I just kept telling her I don't know, I don't know.

Her former husband returned with the bottle of wine and Tylenol P.M. tablets, which T.W. had also asked him to get for her.  She drank the entire bottle took two Tylenol P.M. tablets, and slept for a few hours.  When she awoke in the evening, she texted a friend from Georgia and told him "that my boss had raped me."  After exchanging a few texts, her friend called her and urged her to report the crime to the police and tell her former husband and her sister.  She testified she was initially utterly unwilling to tell anyone else.  However, her friend "threatened" her that if she did not do this within thirty minutes, he would "call [her] sister and tell her, so that she could force [her] to go to the police."  T.W. took another Tylenol P.M. tablet, shut her phone off, laid down, and fell asleep.

At 3:09 p.m. the next day, T.W. called the Long Branch Police Department and reported the sexual assault.  She texted her friend J.H. and followed up with an email describing the events of the night in detail.  T.W. testified the email "describe[ed] my whole night, my evening, everything that he did to me."  She gave her mother a copy of the email because she "couldn't face my mom and tell her what happened to me . . . ."  She arrived at the Long Branch police station to report the sexual assault at approximately 5:00 p.m. on October 20, 2015.  She

17

brought with her a copy of the email she wrote to document the incident as well as the clothes she wore that night, which consisted of black pants, long sleeve black shirt, black bra, and a black sweater.

Long Branch Patrol Officer Tracey Widdis was assigned to interview T.W. and prepare the report to document her statement. T.W. arrived at the station accompanied by Willie McCloud, a man with whom she was romantically involved at the time. Officer Widdis described T.W.'s demeanor as "noticeably uncomfortable" and "crying occasionally." Officer Widdis also advised T.W. she needed to go to a hospital to be interviewed and gynecologically examined by a "sexual assault nurse examiner" (SANE). T.W. declined to undergo this type of examination. Defense counsel asked Officer Widdis if she tried to convince T.W. to undergo the examination.

> Q. Did you make any comments to her when she declined the SANE exam or the rape kit?
>
> A. I asked her to rethink about that. There was another detective, who just happened to be working, Detective Brown, who also explained the importance of a SANE exam.

At this point, the prosecutor objected to this question, prompting the following sidebar discussion and ultimate ruling by the trial judge:

> PROSECUTOR: She's not an expert on this. She can't testify to that.

THE COURT: Proffer as to where you're heading with this witness?

DEFENSE COUNSEL: I'm just asking her, she's a trained police officer. She suggested that the victim take the exam. She should have some knowledge of what it does. I'm not saying there's no expert testimony being requested.

THE COURT: I will allow you some leeway, but get in and out of this area.

     . . . .

[Officer Widdis's testimony in response to Defense Counsel's question.]

A. It is very important. Obviously the earlier it's done is ideal, but SANE exams can be done up to five days from the incident; and depending on the circumstances, we will call -- if it's beyond five days, the SANE nurse explains the circumstances, and I believe there's even a couple of extra days after that five-day window.

Q. As far as you know, the clothes that were handed over, were they tested?

A. I do not know.

Q. Now, as a part of interviewing her, did you look over her body for any kind of injuries or any kind of marks?

A. I did.

Q. Did you see any kind of marks or injuries?

A. I did not see any visible injuries.

19

Q. Did she claim of going to get treatment for any kind of injuries?

A. No.

DEFENSE COUNSEL: Nothing further, Judge.

The State also called T.W.'s romantic partner, Willie McCloud, as a witness. He testified while T.W. was giving her statement to Officer Widdis, he went to confront defendant at his place of employment. McCloud was familiar with the location and hours of the shifts because he used to work there as a DSP. According to McCloud, defendant told him he knew him. When McCloud told defendant he was T.W.'s boyfriend, defendant abruptly closed the door of the apartment where he was working as a DSP. At this point, McCloud heard sirens and mistakenly thought defendant had called the police and decided to return to his car.

McCloud testified that he called defendant from his car with the intent of talking to him about T.W. When he asked him again if he had sexually assaulted T.W., defendant "started going around in circles. Not saying yes, but he didn't say no." McCloud pressed the issue for a definitive answer: "Like I want an answer. You know, just a yes or a no, and he said it was consensual. I left it at that." McCloud then drove to the Long Branch police station and gave a five-page written statement to the officers investigating the case.

20

On October 21, 2015, T.W. called her supervisor Sharon Temple and told her defendant had sexually assaulted her during October 19, 2015, nightshift. T.W. then returned to the police station and met with Michael Verdadeiro, the detective assigned to her case. He testified "she seemed visibly upset" and her voice was "shaky." She cried at times and showed "every indication . . . something serious had occurred to her." Detective Verdadeiro took a formal statement from T.W., describing in detail defendant's behavior which ultimately resulted in the sexual assault. Detective Verdadeiro testified the interview took more than four hours.

Detective Verdadeiro drove T.W. to Monmouth Medical Center after she agreed to undergo the SANE examination. While on the way to the hospital, T.W. told Detective Verdadeiro she was concerned about the examination because she had begun menstruating that morning. However, the SANE nurse assured her this would not affect the efficacy of the examination. Registered Nurse Agnes Panten performed the forensic gynecological examination and collected forensic material for analysis. Detective Verdadeiro took custody of the sealed SANE kit and logged it into evidence. The SANE kit and T.W.'s clothing were sent to the State Police laboratory for analysis. The laboratory report did not find any evidentiary value in the materials submitted for analysis.

21

On November 19, 2015, Detective Verdadeiro telephoned defendant and asked him to voluntarily come to the police station to discuss the sexual assault allegations made against him. According to Detective Verdadeiro, defendant was not surprised to receive a call from the police about this matter. He stated: "I did not touch her. All we did was work and took care of the clients." On cross-examination, Detective Verdadeiro stated the only involvement the police had with the case consisted of interviewing T.W., collecting her clothing, and escorting her to the hospital for the SANE examination

Defendant waived his right to testify in his own defense and did not present any witnesses. The jury began deliberations at 10:48 a.m. on May 21, 2019. At 1:58 p.m., the jury unanimously found defendant guilty of second degree sexual assault and fourth degree criminal sexual contact.

## II.

Against this factual backdrop, defendant raises the following arguments in this appeal.

POINT I

THE STATE ADMITTED UNDULY PREJUDICIAL EVIDENCE RESULTING IN AN UNFAIR TRIAL REQUIRING A NEW TRIAL.

A-0991-19

POINT II

THE TESTIMONY OF THE SANE NURSE
EXCEEDED THE SCOPE OF A LAY WITNESS.

POINT III

DEFENDANT RECEIVED INEFFECTIVE
ASSISTANCE OF COUNSEL.

POINT IV

PROSECUTORIAL MISCONDUCT MANDATES A
NEW TRIAL.

POINT V

THE VERDICT WAS AGAINST THE WEIGHT OF
THE EVIDENCE.

POINT VI

A NEW TRIAL IS WARRANTED DUE TO
CUMULATIVE ERROR.

POINT VII

DEFENDANT'S SENTENCE IS BOTH ILLEGAL
AND EXCESSIVE.

We reject these arguments and affirm. We start our analysis by addressing

legal argument Point One. In her direct testimony, T.W. noted she and defendant

were discussing work-related matters when defendant made a disturbing

comment about a twelve-year-old girl.  The following part of T.W.'s testimony

captured defendant's alleged prejudicial comment:

> I used to wear flip flops a lot or like open toe shoes, and
> he said that that was something that the policy, they
> changed the policy or where -- or they are enforcing the
> policy.  So we kind of just went back and forth,
> bantered about that.
>
> He made mention of another young lady in an
> apartment.  He said -- and that's the only thing that
> really kind of like threw me off is when he made
> mention of a [twelve-year-old] in another apartment.
> He said there's a [twelve-year-old] in the other
> apartment who probably wants to fuck me, but if I did,
> she probably would tell everybody.
>
> [(emphasis added).]

In a series of follow up questions by the prosecutor, T.W. testified

defendant made this comment before he made any sexual innuendos to her.  In

fact, T.W. made clear "there [were] no [twelve-year-old girls] working there."

Furthermore, defense counsel did not object to this line of questioning at the

time.  The first time this issue was brought to the attention of the trial judge by

defense counsel was in a post-verdict motion for a new trial.  Defendant framed

the issue before the trial judge as an admission of N.J.R.E. 404(b) evidence

without applying the four-prong test for admissibility under State v. Cofield,

127 N.J. 328, 336 (1992) or providing the jury with any limiting instructions.

Rule 3:20-1 authorizes the trial judge to grant a defendant a new trial "if required in the interest of justice." The judge found no legal or factual basis to overturn the jury's verdict.

The State correctly maintains defendant's argument must be reviewed under the plain error standard because defendant did not object at trial to the admission of T.W.'s testimony. The plain error standard provides:

> Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.
>
> [R. 2:10-2.]

Reversal is warranted only when the possibility of an injustice is "'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Here, when viewed under the totality of the evidence presented at trial, this vulgar, highly disturbing, yet fleeting comment attributable to defendant does not come close to meeting the plain error standard codified in Rule 2:10-2.

With respect to argument Point II, our Supreme Court has made clear claims of ineffective assistance of trial counsel are ordinarily ill-suited for

25

review on direct appeal because they "involve allegations and evidence that lie outside the trial record." State v. Castagna, 187 N.J. 293, 313 (2006) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)). Here, defendant's allegations attacking the performance of his trial attorney are based purely on matters outside the record developed at trial. cf. State v. Allah, 170 N.J. 269, 285 (2002).

We thus decline to consider defendant's claim of ineffective assistance of trial counsel in this appeal. Defendant may raise these claims attacking the effectiveness of his trial counsel in a timely filed post-conviction relief petition. R. 3:22-1 to -13. Defendant's remaining arguments attacking the outcome of the trial lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

We finally address defendant's argument with respect to the sentence imposed by the trial judge. The judge found aggravating factors N.J.S.A. 2C:44-1(a)(1) (the nature and circumstances of the offense, the role defendant played in committing the offense, including whether or not he committed the offense "in an especially heinous, cruel, or depraved manner"), N.J.S.A. 2C:44-1(a)(3) ("the risk that the defendant will commit another offense"), and N.J.S.A. 2C:44-1(a)(9) ("the need for deterring the defendant and

others from violating the law"). He also found mitigating factor N.J.S.A. 2C:44-1(b)(7) (defendant did not have any criminal history and has led a law-abiding life before he committed this offense).

To support these aggravating factors, the judge found defendant terrorized T.W. "for a long period of time that evening." Although not expressly stated, the judge noted defendant used his "supervisory position" to facilitate the encounter with T.W. and to create an isolated, vulnerable environment where he could impose his will by using his physical superiority to violate her bodily integrity. We agree. The record shows defendant carefully planned this heinous crime in a manner that maximized the victim's vulnerabilities and placed him in complete control. He transformed a home intended for the care of seriously disabled adults into a dungeon of depravity. With predatory precision, he used his position as both a man and as her supervisor to corral T.W. into the bathroom, where she thought she might be safe. He then attacked his victim and gained access to the bathroom with a key she did not know existed. From this point forward, he exerted his physical dominance and took violent control over T.W. The judge's determination that defendant's conduct was "especially heinous, cruel, [or] depraved" is fully grounded in the record before the sentencing court.

State v. Fuentes, 217 N.J. 57, 76 (2014). These same facts also support aggravating factors N.J.S.A. 2C:44-1(a)(3) and (9).

The judge also properly declined to merge second degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and fourth degree criminal sexual contact, N.J.S.A. 2C:14-3(b). The evidence presented at trial shows these were two separate crimes committed on two separate occasions. Defendant committed fourth degree criminal sexual contact when he grabbed T.W. by the waist and head, and then attempted to kiss her on the neck. These two crimes were not only chronologically discrete offenses, but they also involved different levels of violence and acts of sexual violation. As such, merger is not appropriate. See State v. Miller, 237 N.J. 15, 34-35 (2019). A nine-year term of imprisonment subject to the parole restrictions of NERA is supported by the evidence and well within the judge's discretionary authority under the circumstances. State v. Case, 220 N.J. 49, 65 (2014).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0991-19