# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0340-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DAVID C. THOMAS,

    Defendant-Appellant.

_____

> Submitted January 21, 2026 – Decided April 13, 2026
>
> Before Judges Gooden Brown and Torregrossa-O'Connor.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 15-08-0590.
>
> Jennifer N. Sellitti, Public Defender, attorney for appellant (Howard W. Bailey, Designated Counsel, on the briefs).
>
> Andrew B. Johns, Gloucester County Prosecutor, attorney for respondent (Michael C. Mellon, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant David C. Thomas appeals from a September 17, 2024 Law Division order denying his application for post-conviction relief (PCR) without an evidentiary hearing. Because defendant failed to make a prima facie showing of ineffective assistance of counsel,[1] we affirm.

I.

Charged with first-degree aggravated sexual assault of a helpless or incapacitated victim, N.J.S.A. 2C:14-2(a)(7); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree terroristic threats, N.J.S.A. 2C:12-3(b); and first-degree aggravated sexual assault by force or coercion, causing severe bodily injury, N.J.S.A. 2C:14-2(a)(6), defendant was tried by jury and convicted in 2017 of aggravated sexual assault on a physically helpless victim, and a lesser-included offense of simple assault. The trial court sentenced defendant to twenty years' imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On direct appeal, we affirmed defendant's conviction. State v. Thomas, No. A-5245-16 (App. Div. Aug. 22, 2019). There, we exhaustively detailed the trial record. We derive from our prior summary, and from the trial and PCR

---

[1] See Strickland v. Washington, 466 U.S. 668 (1984); State v. Fritz, 105 N.J. 42, 58 (1987).

A-0340-24

records, the following salient facts and procedural history pertinent to this appeal.

A. The Trial

Defendant, thirty-eight-years-old at the time of the offense, did not dispute he had sexual intercourse with then-eighty-three-year-old R.B.[2] in her apartment on July 23, 2015. Id. at 2. However, in his video-recorded statement to police, played for the jury at trial, and in his trial testimony, defendant claimed the encounter was consensual. Id. at 8. R.B., unfortunately deceased by the time of trial, had previously made a series of statements to various individuals consistently reporting defendant "raped" her, which were admitted into evidence at trial. Id. at 3-6.

The court held a pretrial hearing to determine the admissibility of the various hearsay statements the State sought to present at trial. Id. at 9. The court determined R.B.'s statements made to her neighbor, A.F., in the immediate aftermath of the assault, were admissible both as excited utterances, N.J.R.E. 803(c)(2), and also as statements of then-existing mental, emotional, or physical condition, N.J.R.E. 803(c)(3). Id. at 9-10. The court similarly deemed

---

[2] We use initials to protect the privacy of the victim and witness. R. 1:38-3(c)(12).

A-0340-24

admissible certain statements R.B. made to police on the day of the incident.  Id. at 10.

Beyond the contested issue of consent, the remaining facts were largely undisputed.  As we previously observed in recounting the trial record, R.B. lived alone in an apartment complex next door to defendant's uncle.  Id. at 2.  A.F. lived in an apartment upstairs and described R.B. as "elderly" and "generally capable of running errands and taking care of herself, but by no means 'active.'"  Id. at 2-3.  By contrast, defendant was much younger, stronger, had military training, and "worked in seismic drilling, lifting hundred-pound aluminum poles into holes in the ground."  Id. at 2.

A.F. testified at trial that R.B. called her on July 23, 2015 frightened and crying and reported she had been raped.  Id. at 3.  As we previously summarized:

> A.F. rushed down to R.B.'s apartment, where she found R.B. disheveled, crying, wet, with blood "all over" her torso.  A.F. also saw blood on the bedroom and bathroom doors "like someone had dragged along a body."  A.F. testified that R.B. had told her "Cliff's nephew," who R.B. had seen before but did not know well, was the man who raped her.  R.B. also told A.F. that defendant had a knife and dragged her into the bedroom by the hair before raping her.  A.F. noted that R.B. was walking with a limp.  R.B. told A.F. that "the way he pushed her legs back" injured her hip.

4

A-0340-24

A.F. asked R.B. if she had called 9-1-1. R.B. responded, "No. He said he would kill me if I called the police." A.F. then called 9-1-1.

[Ibid.]

Sergeant Ryan Knight responded along with other officers and found R.B.

sitting on the couch wearing a white nightgown that was "half on/half off her top." The officers described R.B. as disheveled, visibly shaken, very frightened, and under "extreme distress." R.B. was breathing heavily and repeatedly stated that she could not breathe.

[Id. at 3-4.]

Sergeant Knight's body worn camera (BWC) recorded his interaction with R.B., who immediately told police without prompting, "he raped me," and "he's in the neighborhood you got to pick him up." Id. at 4. She told police defendant knocked on her door, and when she answered he "grabbed" her, "took [her] clothes," and "took [her] to [her] bed." Id. at 5. She told police defendant threatened to kill her if she called the police. Id. at 6. Police found blood in several locations in the apartment including the couch, the bedroom, and the bathroom, and found lacerations on R.B.'s arm and clothing on her bed. Id. at 3-6.

R.B. was then transported to the hospital on the day of the incident. Id. at 6. The treating emergency room doctor testified R.B. reported she had been

5

A-0340-24

assaulted.  Id. at 7.  The examination revealed tenderness of the chest and abdomen from blunt force trauma, as well as blood in the vaginal area and a skin tear.  Id. at 6-7.  R.B. complained of pain over her body, including her ribs, and could not be moved from the emergency room because "R.B. had trouble breathing and repeatedly grabbed her ribs on the right side."  Id. at 6.

We previously recounted the sexual assault nurse examiner (SANE nurse) Gretchen Raimondo's testimony concerning her examination of R.B., which included:

> bleeding, swelling, and tenderness around R.B.'s vagina and posterior fourchette.  She also noted petechiae — blood collected under the skin — underneath R.B.'s right eye over her cheek.  The nurse observed a three-centimeter skin tear, a large area of petechiae and bruising on her right arm, a significant bruise on the left side of her hip, and petechiae on her left forearm.  R.B. also had swelling, bruising, and soreness on the outer part of her anus.
>
> [Id. at 6-7.]

The SANE nurse testified on redirect that R.B. "repeatedly" told her the encounter "was not consensual and that she told her assailant to stop and that she was in pain."  Id. at 7.  As we noted, the SANE nurse explained R.B.'s injuries were "'very consistent' with sexual assault," but acknowledged

6

consensual sex "could" lead to injury at R.B.'s advanced age, depending on the degree of force used.  Ibid.

Two days later, R.B. returned to the hospital via ambulance complaining of rib pain on her left side.  The then-attending emergency room doctor, Dr. Natalie P. Snyder, testified R.B. explained "she had been raped two days prior and that she was seen in the ER but came back because she was having persistent pain in her left side."  The doctor then examined R.B. in the area of complaint where she also observed "diffused bruising" of the arms and chest.  The doctor indicated R.B. explained the dressing on her arm had been placed during the emergency room visit two days earlier and covered an injury from "the rape."  After a chest x-ray, R.B. was diagnosed with two rib fractures and pneumonia.  Ibid.  She was prescribed medication and discharged.

In his recorded statement played for the jury at trial, defendant described himself as "buzzed" from alcohol and marijuana, when he "went to R.B.'s apartment to give her a few dollars to repay her for her generosity towards his uncle."  Id. at 8.  He claimed "R.B. invited him in for a cigarette, and while the two of them sat in the living room, she began showing him old pictures of herself that 'got him excited.'"  Ibid.  Defendant told police the two began having sex

7

A-0340-24

on the couch, but R.B., concerned someone might come in, "ran into her bedroom," where they continued having sex. Ibid.

He indicated "R.B. was shouting in pleasure, [but] stopped having sex with her when she said it was starting to hurt and that she thought she was going to have a heart attack" and "stated he thought he was 'doing the world a favor' because she was 'an old lady' and had not had sex since 1985." Ibid. He further

> admitted that he might have been too rough with R.B., stating that he "wasn't that gentle with her" but that he "didn't beat her up or nothing like that." He denied punching R.B., but admitted giving her "a little tap" on the side of her head. He said he did not hit her again because she expressed displeasure with the action. When asked how R.B. might have obtained her bruises, defendant said the bruising might have been "grab marks" from him holding her because "she's an older lady, she's not limber." Defendant told the detective that he "should have stopped from like the first resistance."
>
> [Id. at 8-9.]

In his trial testimony, defendant again claimed R.B. consented to the sexual encounter. Id. at 11. He described drinking with his uncle before stopping by R.B.'s apartment to give R.B. money. He explained R.B. invited him in, and there was chemistry between them as they sat on the couch. He testified R.B. showed him pictures of herself, to which he asked the victim sexually explicit questions. He described pulling R.B. toward him by the legs

8

and performing oral sex before R.B. got up to lock the door and took him to her bedroom.

He explained the cuts and bruises on defendant's arm resulted from her falling between the bed and the nightstand to retrieve a fallen lamp. Ibid. As we summarized, defendant claimed:

> R.B. could not stand back up on her own after falling, so he "grabbed her by the other arm where . . . the other bruise is" and "pulled her up quick" to get her back on the bed. He acknowledged that he questioned whether it was "a good idea" to recommence sexual relations with R.B., but she said "I want my last time to be with you" and, although she looked "like kind of a sad, broken-down old lady[,]" he continued to have sex with her. He testified that this was what he referred to as "the first resistance" when he was interviewed by the detective. He admitted that he thereafter "popped her in the head and asked her if she like[s] that," figuring that she "like[d] it rough."
>
> [Ibid. (omission and alterations in original).]

Defendant admitted R.B. expressed feeling pain, but testified she later thanked him and "assured him she would not call the police." Id. at 11-12.

After the court denied defendant's motion for judgment of acquittal and closing arguments concluded, the court instructed the jury as to all charged and lesser-included offenses. Pertinent to defendant's PCR arguments, the judge instructed the jury in accordance with the model jury charge for aggravated

9

A-0340-24

sexual assault of a physically helpless victim, N.J.S.A. 2C:14-2(a)(7). See Model Jury Charges (Criminal), "Aggravated Sexual Assault (Mentally Incapacitated) (N.J.S.A. 2C:14-2a(7)) (Offenses arising after March 17, 2012)" (Feb. 6, 2012). The court instructed the jury that in order to find defendant guilty of that offense it needed to find beyond a reasonable doubt defendant knowingly engaged in an act of sexual penetration at a time when R.B. was physically helpless. Specifically, the court explained, "Physically helpless means that condition in which a person is unconscious, or is physically unable to flee or is physically unable to communicate unwillingness to act."

In connection with the charge of aggravated sexual assault by force or coercion under N.J.S.A. 2C:14-2(a)(7), the court again adhered to the model charge. See Model Jury Charges (Criminal), "Aggravated Sexual Assault Physical Force or Coercion With Severe Personal Injury (N.J.S.A. 2C:14-2(a)(6))" (rev. Sep. 8, 2008). In this context, the court provided a charge defining consent. Specifically, the court instructed the jury to consider "whether the defendant's alleged act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the victim had freely given affirmative permission to the specific act of sexual penetration." The court then defined in detail the terms "freely given affirmative permission," and

10

"reasonable belief," and squarely placed the burden on the State to establish the lack of both and all elements of the offense.

During its deliberations, the jury requested the court "clarify physical helplessness." Defense counsel argued the court should further explain "unable to flee as meaning someone that's totally incapacitated and not ambulatory that can't move at all." The court considered and rejected the suggestion "physically helpless" and "unable to flee" required the State to show total physical "immobility" and re-instructed the jury in accordance with the model jury instruction.

Thereafter, the jury found defendant guilty of aggravated sexual assault upon a physically helpless victim, and simple assault, and not guilty of all remaining counts.

B. Direct Appeal

On direct appeal, we first considered and rejected defendant's argument that the evidence was insufficient to support the jury's finding that R.B. was physically helpless. Thomas, slip op. at 14-16. We specifically concluded "ample evidence" existed upon which "a reasonable jury could have concluded that the elderly R.B. was physically unable to flee from the younger and stronger defendant." Id. at 15. We further noted the evidence supported a jury's viewing

11

R.B.'s injuries, "inflicted by defendant as he manhandled her, to be evidence of her inability to escape from him." Id. at 16.

We next discerned no merit to defendant's argument that plain error resulted when the trial court failed to sua sponte instruct the jury regarding the defense of consent as applicable to the aggravated assault on a physically helpless victim charge, N.J.S.A. 2C:14-2(a)(7). Thomas, slip op. at 17-20. We noted the instruction as a whole advised the jury regarding the concept of consent, but further recognized defendant testified and argued the encounter was consensual. Ibid. We determined the evidence "[a]part from defendant's testimony, . . . in no way suggested R.B. consented . . . ." Id. at 19. Further, we observed "defendant's account . . . was not completely exculpatory," as he "admitted striking R.B. in the head while having sex with her and being so rough that he may have caused her bruising" and that he failed to stop "after the first resistance." Id. at 20.

Finally, we concluded defendant was not denied his right to confrontation by admission at trial of Sergeant Knight's BWC footage depicting R.B. reporting defendant had raped her and threatened her with harm if she reported the assault. Id. at 23. We rejected defendant's claim that R.B.'s statements were testimonial narratives of a completed crime after any danger had dissipated. Ibid. We

12

determined R.B. made the statements while fearing defendant's return, perceiving an ongoing emergency, and seeking help from A.F. and the police. Ibid. Thus, we discerned no error in their admission. Ibid.

### C. PCR Proceedings

Defendant subsequently filed a timely self-represented PCR petition on April 18, 2022 in which he claimed that trial counsel was deficient for failing to: request a jury charge regarding a consent defense to the aggravated sexual assault upon a physically helpless victim charge; raise during the pretrial motion to admit statements by R.B. to police the two-hour delay in police response to the scene; advocate for inclusion of examples in the jury instruction on physical helplessness; and for allegedly making a racist gesture during one of the court proceedings. Defendant also claimed appellate counsel was ineffective for failing to: raise the admissibility of A.F.'s statements to police, meet with defendant before submitting his brief, and include a handwritten addendum prepared by defendant.

PCR counsel subsequently submitted a brief and supplemental certification by defendant. The counseled brief alleged trial counsel was ineffective for failing to object to the admission of R.B.'s hearsay statements to the SANE nurse and, two days later, to the second emergency room physician

13

explaining the sexual encounter was not consensual and she had been raped. The brief incorporated by reference the claims raised in defendant's earlier petition, but made no further factual or legal arguments in furtherance of those claims.

The PCR court held a hearing during which defense counsel argued trial counsel was deficient when he failed to object to the SANE nurse's testimony about R.B.'s statements. The State responded contending the statements were elicited only on redirect after defense counsel repeatedly questioned the SANE nurse regarding impressions of whether the injuries resulted from a consensual encounter. PCR counsel asserted the defense did not "open the door" to admission of R.B.'s statements, and if defendant's trial counsel did so, this amounted to ineffective assistance of counsel. PCR counsel argued trial counsel was similarly deficient for failing to object to R.B.'s statements made to the doctor during the second emergency room visit, claiming the statements were not statements made for purposes of medical diagnosis and treatment admissible pursuant to N.J.R.E. 803(c)(4).

In denying defendant's PCR claims in their entirety without an evidentiary hearing, the court in its written decision addressed, analyzed, and rejected each argument. The court first determined R.B.'s statements to the SANE nurse were

A-0340-24

admissible because defendant opened the door by challenging the SANE nurse's testimony that R.B.'s injuries were possibly sustained during a consensual sexual encounter. Thus, the court found defendant's counsel was not ineffective for failing to object to otherwise admissible testimony. The court similarly found trial counsel was not deficient in allowing the second emergency room physician's testimony concerning R.B.'s statements, finding they were admissible as made for the purpose of a medical diagnosis or treatment. Additionally, the court found, even if admission of one or both of the statements was error, defendant failed to show prejudice as other evidence demonstrated R.B. reported she was raped, including the BWC video of R.B. relaying her account directly to police.

Citing this court's decision on direct appeal, the PCR court also rejected defendant's claim in his self-represented petition asserting trial counsel was ineffective for failing to request a consent charge to the aggravated sexual assault upon a physically helpless victim charge. The PCR court found this court had already determined the trial court did not err in failing to provide the consent instruction. Accordingly, the PCR court reasoned, "Even if the lack of an objection was found to be deficient, it was not prejudicial and would not have changed the outcome at trial."

15

The PCR court next addressed defendant's assertion trial counsel failed to effectively argue during the pretrial hearing the inadmissibility of R.B.'s statements to police after the assault based upon the length of the delay between the sexual assault and the police response afterward. The PCR court found the trial court was aware of the timing, obviating the need for trial counsel to further emphasize it. The PCR court found, regardless of any arguable error, defendant made no showing of a reasonable probability of a different outcome had defense counsel stressed more expressly the temporal delay already known to the pretrial motion court.

The PCR court also noted the trial court's reading the correct legal definition of physically helpless to the jury after it asked the court to clarify the term was not error and found there was nothing misleading or inaccurate about the instruction as provided. It found defendant made no showing of prejudice. The PCR court likewise determined defendant presented no evidence trial counsel made a racist gesture, raising only a bald assertion.

Regarding defendant's arguments that appellate counsel was deficient for omitting a challenge on direct appeal to A.F.'s hearsay statements to police relaying R.B.'s statements to her, the PCR court found defendant failed to establish appellate counsel was deficient or that any prejudice resulted from the

A-0340-24

omission of this argument on appeal. The PCR court emphasized the significant independent evidence of R.B.'s claims. The court further found no showing that any alleged failure by appellate counsel to communicate with defendant or to submit an unauthorized "addendum" from defendant impacted the outcome of the appeal.

## II.

### A.

On appeal, defendant argues:

POINT I

THE [PCR] COURT ERRED IN RULING THAT THE TRIAL ATTORNEY HAD NOT BEEN INEFFECTIVE FOR FAILING TO OBJECT TO THE HEARSAY TESTIMONY OF SANE NURSE RAIMONDO AND DR. SNYDER, MISAPPLYING R. 803(C)(4) (STATEMENTS FOR PURPOSES OF MEDICAL DIAGNOSIS OR TREATMENT).

POINT II

THE [PCR] COURT ERRED IN DENYING . . . DEFENDANT'S PETITION FOR [PCR] WITHOUT AFFORDING HIM AN EVIDENTIARY HEARING TO FULLY ADDRESS HIS CONTENTION THAT HE FAILED TO RECEIVE ADEQUATE LEGAL REPRESENTATION FROM HIS TRIAL AND APPELLATE COUNSEL.

A. THE PREVAILING LEGAL PRINCIPLES REGARDING CLAIMS OF INEFFECTIVE

17

ASSISTANCE OF COUNSEL, EVIDENTIARY HEARINGS, AND PETITIONS FOR [PCR].

B. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO BUILD A BASIS TO SUPPORT THE DEFENSE OF "CONSENT," AND THE COURT GIVING THE "CONSENT" CHARGE TO THE JURY.

C. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO ARGUE IN RESPONSE TO THE JURY REQUEST FOR ELABORATION ON THE DEFINITION OF "HELPLESS," THAT THE JUDGE GIVE THE EXAMPLE OF ["]SLEEPING OR UNCONSCIOUS[,"] AS REQUESTED BY [DEFENDANT].

D. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO RAISE THE PASSAGE OF TIME BETWEEN THE 9[-]1[-]1 CALL AND THE ARRIVAL OF THE POLICE DURING THE MOTION IN LIMINE.

POINT III

THE COURT MISAPPLIED ITS DISCRETION IN APPLYING R. 3:22-5 AS A PROCEDURAL BAR AGAINST . . . DEFENDANT'S FILING FOR [PCR].

A. [DEFENDANT]'S CLAIMS ARE NOT BARRED BY R. 3:22-5.

18

B.

Appellate review of an order granting or denying PCR contains both questions of law and fact. State v. Harris, 181 N.J. 391, 415-16 (2004), cert. denied, 545 U.S. 1145 (2005). We give deference to the PCR court's factual findings and uphold those findings that are "supported by adequate, substantial and credible evidence" in the record. Id. at 415 (quoting Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)). However, a PCR court's legal conclusions are reviewed de novo. See id. at 416 (citing State v. Marshall, 148 N.J. 89, 185 (1997)).

Reviewing courts employ the two-part test first established in Strickland, 466 U.S. at 687, to determine whether a defendant has been deprived of the effective assistance of counsel. Failure to establish either prong requires the denial of a PCR petition founded on an ineffective assistance of counsel claim. Id. at 700.

To satisfy the first prong, defendant must demonstrate counsel's performance was deficient and "fell below an objective standard of reasonableness" and "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687-88. Defendants "must allege specific facts and evidence supporting

19

[their] allegations." State v. Porter, 216 N.J. 343, 355 (2013). "[B]ald assertions" will not suffice. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). Further, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Under Strickland's second prong, a defendant must "affirmatively prove" "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." State v. Gideon, 244 N.J. 538, 551 (2021) (quoting Strickland, 466 U.S. at 694). "Although a demonstration of prejudice constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted); see also State v. Alvarez, 473 N.J. Super. 448, 455-56 (App. Div. 2022).

We have reviewed the extensive record and defendant's arguments and conclude the claims lack merit for substantially the same reasons set forth by the PCR court in its comprehensive written decision. We emphasize only the following.

Like the PCR court, as to each claim, we are satisfied defendant failed to make a threshold showing of prejudice regardless of any claim of error by defendant's trial counsel. With respect to the contentions of improperly admitted hearsay statements by R.B., we note the weighty independent evidence of R.B.'s claims, including the BWC video of R.B. recounting what occurred and reporting she had been raped. R.B. was uniformly described as bloody, shaken, and frightened when she called for help, and the video depicted her account of events in her own words. In light of this compelling evidence, we conclude any minimal repetition of R.B.'s claims to others, even if otherwise inadmissible as hearsay, was of no moment.

Regarding the additional claims about defendant's trial counsel raised in defendant's self-represented petition, we note defendant failed to show any prejudice from the jury instructions we already found sufficient on direct appeal. Defendant's claims R.B. consented to the encounter permeated the trial, as did the State's substantial evidence the elderly and weak R.B. was unable to flee

21

from defendant. We discern no prejudice in defendant's counsel's failure to request the court charge the jury on the defense of consent—later provided in its entirety to the jury—during the substantive charge under N.J.S.A. 2C:14-2(a)(7).

We likewise reject defendant's claims trial counsel's failure to advocate for the court to provide examples of physical helplessness in response to the jury's questions. We note defense counsel did in fact argue that the jury should be advised physical helplessness required a showing of immobility and incapacitation. Thus, we discern no deficiency on the part of trial counsel. Further, defendant has not established what if any legally accurate variation from the model charge or the actual legal definition of physical helplessness would have been appropriate or made probable a different outcome.

Finally, we are satisfied defendant failed to make even a preliminary showing that his counsel on direct appeal fell below the threshold of effective advocacy. See State v. Morrison, 215 N.J. Super. 540, 549 (App. Div. 1987) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)) ("[A]ppellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant."); see also State v. Echols, 199 N.J. 344, 358 (2009) (mere dissatisfaction with a "counsel's exercise of judgment" is insufficient to warrant

22

overturning a conviction (quoting <u>State v. Castagna</u>, 187 N.J. 293, 314 (2006))). Further, even assuming for purposes of argument that there was some flaw in the chosen appeal strategy, defendant failed to make a sufficient showing of a probability that a different legal challenge would have succeeded or changed the outcome.

To the extent we have not addressed any additional arguments raised by defendant, we determine they lack sufficient merit to warrant further discussion in a written opinion. <u>See</u> <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

_M.C. Hanley_

Clerk of the Appellate Division

23